IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILE DIVISION

FILED

2003 JUL 21  A  9: 29

CLERK U.S. DISTRICT COURT
MIDDLE DIST. OF FLORIDA
JACKSONVILLE, FLA.

SEMINOLE ELECTRIC COOPERATIVE,
INC.,

           Plaintiff,

v.

UTILITY WORKERS UNION OF AMERICA,
LOCAL 551,

           Defendant.

_____/

CASE NO. 3:03-cv-589-J-32 mc;

## COMPLAINT

Plaintiff, SEMINOLE ELECTRIC COOPERATIVE, INC. ("SECI"), by and through its undersigned counsel, sues the Defendant, UTILITY WORKERS UNION OF AMERICA, LOCAL 551 ("UWUA") and hereby seeks a judgment from this Court for an order vacating the arbitration award entered by Arbitrator Roger Abrams on April 28, 2003. In support of its Complaint, SECI states as follows:

### JURISDICTION AND VENUE

1.    SECI and the UWUA engaged in arbitration in Palatka, Florida on February 13, 2003 pursuant to a collective bargaining agreement ("CBA") between the parties. (The CBA is attached hereto as Exhibit 1). This is an action to vacate the arbitrator's award pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

2.    SECI is a corporation duly organized and existing under the laws of the State of Florida, doing business in Palatka, Putnam County, Florida.

71956_1

ALLEN, NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

3. SECI is engaged in an industry affecting commerce within the meaning of 29 U.S.C. § 185.

4. The UWUA is a labor organization representing a bargaining unit of SECI's employees employed in SECI's Palatka, Putnam County, Florida facility.

5. The UWUA is a labor organization representing employees in an industry affecting commerce within the meaning of 29 U.S.C. § 185 and doing business in Palatka, Putnam County, Florida.

6. Jurisdiction and venue are appropriate in this Court pursuant to 29 U.S.C. § 185(a), 28 U.S.C. § 1391(b), and 28 U.S.C. § 1331.

7. The present application is timely filed as the arbitration award was issued by the Arbitrator on or about April 28, 2003 and was received by SECI's counsel on or about May 1, 2003.  (Arbitrator's Award is attached hereto as Exhibit Two).

## STATEMENT OF CASE AND FACTS

8. Following the arbitration of this matter on February 13, 2003, Arbitrator Roger Abrams made the following relevant factual findings:

  a. SECI is a nonprofit provider of electric power to rural communities in 45 counties throughout Florida.

  b. Mark Felten was hired by SECI on or about July 25, 1988 and, after completing an apprenticeship, was employed as a utility mechanic.

  c. In January, 2002, Felten sought a medical leave of absence from his position with SECI.

  d. Effective January, 22, 2002, SECI granted Felten's request for a medical leave of absence.

71956_1

**2**

e.   During his medical leave of absence, Felten was diagnosed by his physician with obstructive sleep apnea.

f.   Felten's physician released him to return to work as of April 6, 2002. (See Exhibit Three attached hereto).

g.   Felten admitted that he knew that an employee was suppose to return to work after being released to do so by his physician.

h.   Notwithstanding, Felten elected not to return to work until April 18, 2002.

i.   Felten had planned to return to work on April 8, 2002 but elected not to do so since he still did not feel good.

j.   Upon his return to work on April 18, 2002, Felten presented his return to work statement from his physician to his supervisor, Carl Krueger.

k.   Krueger had previously discussed with Felten his attendance issue during a coaching session in January, 2002.

l.   Upon receiving the return to work statement, SECI's Manager of Plant Maintenance, Ken Hart, noticed the 12-day gap between when Felten was released to return to work and when he actually returned. Accordingly, he directed Krueger to inquire about the gap.

m.   Krueger directed Felten to supply SECI with medical documentation authorizing leave for the period between April 6, 2002 and April 18, 2002.

n.   Notwithstanding, by April 24, 2002, Felten was unable to provide medical documentation justifying his failure to report to work between April 6, 2002 and April 18, 2002.

o.    On April 24, 2002, Krueger met with Felten to inquire as to the issue. Felten explained that his physician still had some tests to perform as of April 6, 2002, but that he had "begged the doctor for the return to work" notice.

p.    At the April 24, 2002, Felten stated that he did not return to work despite his physician's release because he did not feel well and he felt he it would not be safe to himself or others.  Although he did not feel well as of April 18, Felten reported to work.

q.    Krueger suspended Felten pending further investigation.

r.    On April 26, 2002, Krueger recommended to Hart that Felten be dismissed from his employment because of Felten's inability to account for the 12 day period of unexcused absences.

s.    On April 29, 2002, Hart recommended to his supervisor, Paul Shipskie, that Felten's employment be terminated based upon unapproved absences from work.

t.    In making his recommendation, Hart gave a "good deal of weight" to the fact that Felten had no formal discipline during his tenure with SECI. Nonetheless, Hart felt that this fact did not warrant lesser discipline.

u.    SECI Human Resources Administrator prepared a letter to Felten on May 8 or 9, 2002, notifying him of SECI's decision to dismiss him from his employment.

v.    On May 10, 2002, SECI received a fax from Felten's physician stating that "At this time, I feel the patient is able to return to full-duty work on

Monday, May 13, 2002, with no restrictions." (See Exhibit Four attached hereto).

w.    SECI decided to proceed with Felten's dismissal and notified him by letter dated May 17, 2002. The letter specifically stated that Felten had "provided no document which would excuse your absence from work during the absence in question." (See Exhibit Five attached hereto).

x.    Approximately two years prior to the Arbitration of this matter, SECI's new plant management sought to change the culture at the plant by raising the bar and by aggressively targeting sub-par performance. SECI discussed its commitment in this regard with the UWUA.

9.    Following Felten's dismissal, the UWUA filed a grievance on his behalf and pursued the matter to arbitration before Arbitrator Roger Abrams.

10.    The issue presented for resolution to the Arbitrator was whether Felten was "discharged with just cause in accordance with the provisions of the [CBA]? If not, what shall be the remedy?"

11.    The parties' CBA provides, in relevant part:

a.    In Article III, Section 5 ("Authority of the Arbitrator"), the CBA states, "The arbitrator shall, in no way, alter, amend or modify the terms of this agreement." (Exhibit One, p. 14).

b.    In Article IV ("Management Rights"), the CBA provides:

**Section 1: General**
Any and all rights, powers, privileges, prerogatives and authorities, whether exercised or not, which the Company had or possessed prior to its having recognized the Union, or prior to its having entered into contractual relations with the Union, are retained and

**5**

reserved to the Company unless those rights are specifically and expressly abridged by this Agreement.

The management of the plant and the direction of its work force, including but not limited to the exclusive rights ... to maintain, enforce, rescind or change personnel policies, procedures and rules, plant practices, operations and service guides and other operational procedures, policies and guides not inconsistent with this Agreement; to establish the standards of conduct and work of employees; ... to lay off, discharge, or otherwise release employees from duty for lack of work or for other legitimate reasons; ... shall be vested exclusively in the Company except where such rights are specifically and particularly abridged by the express terms of this Agreement.

**Section 2:  Work Rules**
The Company shall have the right to establish, maintain, enforce, rescind, amend or change work rules and regulations, it being understood and agreed that such rules and regulations shall not be in conflict with any provisions of this Agreement.

*          *          *

Employees violating the Company's rules and regulations may be disciplined up to and including discharge.

(Exhibit One, pp. 17-19).

c.      In Article VI, Section 4 ("Discipline -- Discharge"), the CBA states:

(a)      Employees who have successfully completed their probationary period may be disciplined up to and including discharge for any of the following reasons or for any other just cause:

*          *          *

71956_1

**6**

        11.      Improper absence from duty without authority.

        13.      On or off the job conduct which adversely affects the ability of the employee to perform his/her duties and/or the duties of other employees and/or adversely effects the efficient operation of the Company.

        16.      . . . Unsafe conduct or other misconduct while on duty or on Company property.

        17.      Violation of a posted or otherwise known safety . . . rule or policy.

(Exhibit One, pp. 23-24).

d.     In Article VI, Section 5 ("Discipline -- Arbitration"), the CBA states:

When any employee has been disciplined for one or more of the specifically enumerated reasons set forth in Section 4 above, and said discipline is subjected to Article III, the Arbitrator shall deny the grievance if he is satisfied by a preponderance of the evidence that the employee violated one or more of the specifically enumerated reasons for discipline in Section 4.

(Exhibit One, p. 25).

12.    SECI maintains policies and procedures concerning unauthorized absences and discipline and discharge, including:

a.     Procedure PL-4 provides, in relevant part:

Abuse of sick leave, routine tardiness, or unauthorized absence from work, are grounds for disciplinary action of an employee.

(See Exhibit Six attached hereto).

b.     Policy No. 514, regarding termination, provides, in relevant part:

Actions resulting in discipline, up to and including discharge, include but are not limited to the following:

\*      \*      \*

      e.      Unjustified absence without leave.

      (See Exhibit Seven attached hereto).

c.      Policy No. 517, entitled "Sick and Disability Benefits - Bargaining Unit Employees," provides, in relevant part:

An employee will be expected to return to work after a disability upon receipt of a medical release from an attending physician stating the employee may perform normal job duties. If the employee chooses not to return upon medical release, his or her position may be filled and employment terminated.

(See Exhibit Eight attached hereto).

d.      Plant Practice 5001.55 R2, relating to attendance and tardiness, provides, in relevant part:

    2.1.1   Management reserves the following rights:

        *        *        *

    2.1.1.3   To determine whether or not an absence was necessary or justifiable and determine whether it will be excused or unexcused.

    2.1.1.4   To require employees, at Management's discretion to provide a written doctor's excuse and/or other medical justification establishing that the absence was due to a bona fide sickness or injury.

        *        *        *

**2.3   UNSCHEDULED ABSENCE FROM WORK - WITHOUT NOTIFICATION**

    2.3.1   Unscheduled absence from work without notification will result in the following corrective action unless Management excuses the employee's failure to notify.

    2.3.1.1   Absence from two (2) or more consecutive work shifts will result in termination of employment

71956_1

after review by Human Resources and approval by the General Manager. The individual will also be classified ineligible for rehire.

(See Exhibit Nine attached hereto).

e.      Plant Practice 5001.56, entitled "Disciplinary Action," provides, in relevant part:

3.1.3   This practice is intended to provide recommended but not mandatory penalties to apply to specific offenses. However, the penalty utilized shall be discretionary with management and nothing herein shall require that a particular form of discipline be utilized in any case prior to the utilization of another form of discipline ....

3.1.4   The example offenses listed in this practice are not intended to be all inclusive. In addition to the offenses specifically identified in this practice, employees may be disciplined up to and including discharge for other unacceptable conduct or just cause ....

*       *       *

NOTE: ... However, the Company reserves the right to use any of the forms of discipline at any time ....

*       *       *

3.2.2   SECI reserves the right to use any form of disciplinary action it deems appropriate in each circumstance and will routinely consider the facts, circumstances, and mitigating factors applicable to each disciplinary action on a case by case basis.

(See Exhibit Ten attached hereto).

71956_1

**9**

13.    In his decision, Arbitrator Roger Abrams specifically found that "The parties intended that employees released for work by their attending physicians would return to work forthwith. Felton did not do that. (Exhibit Two, p. 18) (Emphasis in original).

14.    Notwithstanding the fact that Felten was absent from work for twelve days after being released, the Arbitrator found that there was no "improper absence from duty without authorization" since Felten later presented a letter from his physician on May 10, 2002. (Exhibit Two, p. 19). Accordingly, the Arbitrator concluded that "there was no basis under the [CBA] to terminate Felten." (Exhibit Two, p. 19).

15.    In reaching his conclusion, the Arbitrator incorporated a generic "just cause" standard to review SECI's judgment as to the disciplinary penalty imposed notwithstanding the fact that the CBA expressly provides that the Arbitrator must deny the grievance and uphold the discipline if SECI establishes that the employee violated one of the reasons set forth in Section 4 of the CBA.

16.    The facts, as determined by the Arbitrator, clearly establish that Felten was absent from duty without authorization.

17.    The Arbitrator also concluded that Felten had committed misconduct that warranted "serious discipline" by reporting to work on April 18 while "he was still not safe and ready for work." (Exhibit Two, p. 24).

18.    Felten's misconduct in this regard constitutes a violation of Article VI, Section 4(a)(13), (16) and (17). (Exhibit One, pp. 23-24).

19.    Notwithstanding the fact that the parties' CBA provides that the Arbitrator is obliged to deny a grievance and uphold the discipline if he concludes that the employee

committed a violation of Article VI, Section 4, the Arbitrator mitigated the penalty to a four-week suspension and ordered Felten reinstated.  (Exhibit Two, p. 24).

## COUNT ONE

20.     SECI incorporates by reference the allegations set forth in paragraphs 1-19 as if fully set forth herein.

21.     Pursuant to the terms of the CBA, the Arbitrator was without any authority to mitigate the disciplinary penalty in this case once he had found facts establishing that Felten had violated any of the enumerated bases for discipline in Article VI, Section 4.

22.     Notwithstanding the fact that the Arbitrator clearly found a violation of Article VI, Section 4 warranting "serious discipline," he nonetheless ignored the plain language of Article VI, Section 5 by failing to deny the grievance and reinstating Felten.

23.     The Arbitrator's award in this regard constitutes a violation of Article III, Section 5 which expressly limits the authority of the Arbitrator and prevents him from altering or modifying the provisions of the CBA.

24.     By his action, the Arbitrator exceeded the powers and authority given him under the CBA by adding to and modifying the terms of the CBA and, therefore, the decision fails to draw its essence from the CBA.

71956_1

WHEREFORE, Plaintiff, SEMINOLE ELECTRIC COOPERATIVE, INC., respectfully requests this Court enter an Order vacating the Arbitration award and granting it an award of costs and such other and further relief to which Plaintiff is entitled.

Respectfully Submitted

MARK E. LEVITT
Florida Bar No. 193190
BRIAN KOJI
Florida Bar No. 0116297
ALLEN, NORTON & BLUE, P.A.
324 South Hyde Park Ave., Ste. 350
Tampa, Florida 33606
Ph: (813) 251-1210
Fax: (813) 253-2006

71956_1

**12**

# COLLECTIVE BARGAINING AGREEMENT

## BETWEEN

## SEMINOLE ELECTRIC COOPERATIVE, INC.

## AND

## UTILITY WORKERS UNION OF AMERICA

## JULY 1, 1999 - JUNE 30, 2003



Local 551



*J†. 1*

# UWUA CONTRACT
# JULY 1, 1999 - JUNE 30, 2003

Southern Press, Inc.      Gainesville, Florida

# CONTRACT PREAMBLE ........................................ 1

# ARTICLE I - RECOGNITION ................................... 1

SECTION 1:   UNIT ................................................ 1
SECTION 2:   CHECKOFF .......................................... 2
SECTION 3:   VISITATION ......................................... 3
SECTION 4:   STEWARDS .......................................... 3
SECTION 5:   LOCAL UNION OFFICERS ......................... 4
SECTION 6:   INTERFERENCE ..................................... 4
SECTION 7:   CONVENTIONS ...................................... 5
SECTION 8:   BULLETIN BOARDS ................................ 5

# ARTICLE II - SCOPE AND PURPOSE ........................ 6

SECTION 1:   GENERAL ............................................ 6
SECTION 2:   SCOPE ............................................... 7
SECTION 3:   STANDARDS ........................................ 7
SECTION 4:   SAVINGS CLAUSE .................................. 8

# ARTICLE III - GRIEVANCE AND ARBITRATION 8

SECTION 1:   GRIEVANCE .......................................... 8
SECTION 2:   GRIEVANCE PROCEDURE ......................... 9
SECTION 2(A): MEDIATION OF NON-DISCHARGE
             GRIEVANCES PRIOR TO ARBITRATION .... 10
SECTION 3:   ARBITRATION ...................................... 12
SECTION 4:   SELECTION OF THE ARBITRATOR ............ 13
SECTION 5:   AUTHORITY OF THE ARBITRATOR ........... 14
SECTION 6:   DECISION .......................................... 14

i

Section 7:    Time Limits...................................14
Section 8:    Time/Pay......................................15
Section 9:    Limitations..................................16
Section 10: Precedent ...............................16
Section 11: Withdrawal.............................16
Section 12: Review ....................................17

**ARTICLE IV - MANAGEMENT RIGHTS ...............17**

Section 1:    General ....................................17
Section 2:    Work Rules..............................18

**ARTICLE V - STRIKES ......................................19**

Section 1:    Purpose ...................................19
Section 2:    No Strikes/No Lockouts....................20
Section 3:    Union Responsibility .........................20

**ARTICLE VI - DISCIPLINE.................................20**

Section 1:    Probationary Employees ..................21
Section 2:    Types of Discipline........................21
Section 3:    Discipline Other Than Discharge....21
Section 4:    Discharge .................................22
Section 5:    Arbitration.................................25
Section 6:    Witness....................................25
Section 7:    Notice .....................................26
Section 8:    Removal ..................................26

**ARTICLE VII - SENIORITY .................................26**

Section 1:    Probationary Period .....................26

ii

SECTION 2:   COMPANY SENIORITY ..............................27

SECTION 3:   JOB SENIORITY.........................................27

SECTION 4:   LOSS OF SENIORITY ................................27

SECTION 5:   TRANSFER/PROMOTION WITHIN THE
             UNIT..............................................................28

SECTION 6:   TRANSFER OUT OF UNIT .......................29

SECTION 7:   SENIORITY LIST ........................................29

SECTION 8:   LAYOFF.....................................................29

## ARTICLE VIII - JOB BIDDING AND JOB PROGRESSION   ...................................................**31**

SECTION 1:   JOB BIDDING ...........................................31

SECTION 2:   JOB PROGRESSION..................................33

SECTION 3:   WAGE ADJUSTMENT FOR UTILITY ..........34
             CLASSIFICATIONS ....................................34

SECTION 4:   BIDDING OUT .........................................34

## ARTICLE IX - HOLIDAYS........................................**34**

SECTION 1:   RECOGNIZED HOLIDAYS ..........................35

SECTION 2:   HOLIDAYS FALLING ON REST DAYS .......35

SECTION 3:   ELIGIBILITY ..............................................36

SECTION 4:   FLOATING HOLIDAY ...............................36

SECTION 5:   CARRYOVER...............................................37

## ARTICLE X - ANNUAL LEAVE...............................**38**

SECTION 1:   ENTITLEMENT ...........................................38

SECTION 2:   POLICY......................................................38

SECTION 3:   PRO RATA VACATION PAY ....................38

iii

SECTION 4: VACATION PAY .................................39

SECTION 5: CARRYOVER.......................................39

SECTION 6: SCHEDULING ....................................40

SECTION 7: SHUTDOWN .......................................41

SECTION 8: ADVANCES .........................................42

**ARTICLE XI - HOURS OF WORK AND OVERTIME PAY** .......................................................**42**

SECTION 1: GENERAL ..........................................42

SECTION 2: WORK WEEK .....................................42

SECTION 3: DESIGNATION OF SHIFT .............43

SECTION 3(A): SCHEDULE CHANGES ..............44

SECTION 4: PRIOR NOTICE AND CONSULTATION .......45

SECTION 5: MEAL BREAKS ................................45

SECTION 6: OVERTIME ........................................45

SECTION 7: PREMIUMS........................................46

SECTION 8: DUPLICATION...................................47

SECTION 9: CALL-OUT PAY ...............................47

SECTION 10: ASSIGNMENT OF OVERTIME ....47

SECTION 11: BACKSHIFT ....................................52

SECTION 12: REST PERIODS...............................54

SECTION 13: CANCELLATION WITHOUT NOTICE .........56

**ARTICLE XII - LEAVES OF ABSENCE ..................56**

SECTION 1: GENERAL LEAVES ........................56

SECTION 2: JURY DUTY .....................................57

SECTION 3: MILITARY LEAVE...........................57

SECTION 4: JOB UPON RETURN FROM LEAVE OF

iv

ABSENCE............................................58
SECTION 5:   EMERGENCIES...............................58
SECTION 6:   FMLA AND ADA ..........................59

# ARTICLE XIII - WAGES/SHIFT/WEEKEND DIFFERENTIAL .........................................59

SECTION 1:   GENERAL ......................................59
SECTION 2:   PLANT CLERKS, PLANNING ASSISTANT, AND PURCHASING ASSISTANTS...............59
SECTION 3:   SHIFT/WEEKEND DIFFERENTIAL.............60
SECTION 4:   TEMPORARY HIGHER CLASSIFICATION (THC) ........................................61
SECTION 5:   SECTION 401(K) PLAN ..........................62
SECTION 6:   MEAL ALLOWANCE ........................62
SECTION 7:   MASTER SUPPLEMENT ...........................62

# ARTICLE XIV - INSURANCE ..................................63

SECTION 1:   COVERAGE............................................63
SECTION 2:   EMPLOYEE CONTRIBUTION ...................63
SECTION 3:   PAYROLL DEDUCTION...........................63

# ARTICLE XV - RETIREMENT ...............................64

# ARTICLE XVI - MISCELLANEOUS ........................64

SECTION 1:   WORK BY NON-BARGAINING UNIT EMPLOYEES ...........................................64
SECTION 2:   SUBCONTRACTING ..............................65
SECTION 3:   SEARCHES .............................................65

v

SECTION 4:  LOCKERS, DESKS, ETC. ...........................65
SECTION 5:  CALL-OUT - RECORDING ........................66
SECTION 6:  GLOVES.................................................66
SECTION 7:  SUNGLASSES .........................................66

## ARTICLE XVII - JOB PROTECTION, MULTI-TASKING AND MULTI-CRAFTING.........................66

SECTION 1:  JOB PROTECTION....................................66
     A. OVERALL JOB SECURITY....................66
     B. DOWNGRADES................................67
     C. MAINTAINING BARGAINING UNIT
       POSITIONS.................................68
     D. USE OF A CONTRACTOR ....................69
     E. TRANSFER/ASSIGNMENT ...................69
     F. ADDITIONAL STAFFING .....................69
SECTION 2:  ASSIGNMENT FLEXIBILITY/
      MULTI-TASKING ...................................70
SECTION 3:  MULTI-CRAFT..........................................74

## ARTICLE XVIII - COMMITTEES .............................78

SECTION 1:  APPRENTICE TRAINING .........................78
SECTION 2:  SAFETY AND HEALTH .............................79

## ARTICLE XIX - SICK LEAVE...................................81

SECTION 1:  ACCRUAL RATE .....................................81
SECTION 2:  REASONS FOR USE .................................81
SECTION 3:  ACCUMULATION .....................................81
SECTION 4:  USE OF ACCUMULATED UNUSED SICK

vi

               LEAVE BY RETIREES/SPOUSES ................82
SECTION 5:  VERIFICATION .........................................86
SECTION 6:  CHARGING .............................................86

**ARTICLE XX - DURATION** ......................................**87**

**APPENDIX 1 - SHIFT DIFFERENTIAL/MEAL
ALLOWANCE** ..................................................**88**

**APPENDIX 2 - LIGHT DUTY/OVERTIME** .............**91**

**APPENDIX 3 - OPERATOR POSITION
REQUIREMENTS** ...........................................**93**

**APPENDIX 4 - THC TO NON-BARGAINING UNIT
POSITIONS/OVERTIME** ...................................**94**

**APPENDIX 5 - ROTATING SHIFT WORKERS/**

**12 HOURS PER SHIFT** ...................................**95**

**APPENDIX 6 - CLARIFICATION OF OVERTIME
DURING LEAVE** ...................................................**102**

**APPENDIX 7- -LETTER OF AGREEMENT -
SENIORITY TIE-BREAKING RULE** ......................**103**

**APPENDIX A - EFFECTIVE JULY 1, 1999** ............**104**

vii

**APPENDIX B - EFFECTIVE JULY 1, 2000** ............107

**APPENDIX C - EFFECTIVE JULY 1, 2001** ............110

**APPENDIX D - EFFECTIVE JULY 1, 2002** ............113

## CONTRACT PREAMBLE

THIS AGREEMENT, entered into on the 3rd day of June, 1999, effective as of the 1st day of July, 1999, by and between SEMINOLE ELECTRIC COOPERATIVE, INC. (hereinafter referred to as the Company), and the UTILITY WORKERS UNION OF AMERICA, AFL-CIO and LOCAL 551 of the UTILITY WORKERS UNION OF AMERICA, AFL-CIO (hereinafter referred to collectively as the Union), shall remain in effect until midnight the 30th day of June, 2003 unless otherwise provided herein.

## ARTICLE I - RECOGNITION
### Section 1:  Unit

A. The Company recognizes the Union as the exclusive bargaining agent for those employees of the Company in the bargaining unit certified by the National Labor Relations Board in NLRB Case Nos. 12-RC-6496, 12-RC-6497 and 12-RC-7563, which unit includes all production and maintenance employees employed by the Company at its Palatka, Florida, power plant, and Silver Springs, Florida, switching station; but excludes all other employees of the Company, office clerical employees, professional employees, Senior I and C technicians, all control room operators, support system control room operators, senior substation technicians, senior relay technicians, guards and supervisors as defined by the National Labor Relations Act.

B. References

1

The references he, she, his, hers, him and her shall apply to all employees regardless of their gender.

### Section 2:  Checkoff

The Company will, during the term of this Agreement, deduct and remit, monthly to the Union the normal and usual dues uniformly required of its members by the Union of those Union members as shall voluntarily authorize the Company to do so. Such written authorization must be in lawful, mutually acceptable form, and shall be forwarded to the Company through the Treasurer of the Union.

1.  The Treasurer of the Union will keep the Company currently advised of the monthly dues to be deducted from the wages of each Employee who, pursuant to Section 2, shall have filed the required dues deduction authorization with the Union and the Company.

2.  An employee may revoke his dues deduction authorization by signed notice directed to the Company and the Union, by registered mail. Such revocation will be effective upon the next payroll date after receipt of the notice by the Company.

3.  The Union agrees to indemnify, save and hold the Company harmless from any and all claims or suits against the Company or any of its employees because of the Company's collection of dues pursuant to this Section.

2

## Section 3:  Visitation

After having made arrangements with the Director of Plant Operations, or his designee, one UWUA and one Local Union official will be allowed access to Company premises under the following circumstances. The official(s) may not go into any working area at any time without prior permission of the Director of Plant Operations or his designee. The Union official(s) will be allowed, however, to go into the working areas when necessary in the handling of a pending grievance after the grievance is presented in Step 1 of Section 2 of Article III. During any visit into the working area pursuant to the above, the Company shall have the right to have one of its officials accompany the Union representative(s). During such visits, the Union representative(s) will not in any fashion interfere with the work of the employees.

## Section 4:  Stewards

The Union shall have the right to appoint a steward to represent the employees in each department, work location and/or shift; provided, if there are more than 25 employees assigned to a department, work location and/or shift, the Union may appoint up to two stewards for that department, work location and/or shift; provided further, that the total number of stewards shall not exceed 24 at any time.

The Union will notify the Company in writing as to the

3

identity of each steward and the department, work location and/or shift for which he serves as steward. The steward must be an employee on the active payroll of the department, work location and/or shift he serves.

### Section 5:  Local Union Officers

Upon written request of not less than seven (7) calendar days by the President or Secretary, Local Union officers may request time off without pay each month to handle essential Union business off-site; however, the total time off allowed shall not exceed twelve (12) hours per month in total among all officers. Time spent in collective bargaining for a successor contract with Company representatives and the meeting or meetings called by the Union to ratify said agreement shall not count against the twelve (12) hour limitation. Unused hours in a month may be carried over but in no event will the carry over exceed twenty-four (24) hours. In addition, once a year, upon request, the Company shall allow two (2) Local Union officers off without pay for their regular scheduled shift to assist in the annual election of Union officers. Requests under this section shall be made to the Director of Plant Operations or his designee who shall not unreasonably deny such request except for operational reasons.

### Section 6:  Interference

The activities of stewards or Local Union officers shall not interfere with their duties or the duties of other employees. Except as provided in Sections 3, 5 and 7 of this

4

Article, in Article III or elsewhere in this Agreement, or unless voluntarily agreed to by the Company, neither stewards nor Local Union officers shall take time away from their work to perform their duties in behalf of the Union.

## Section 7: Conventions

Two employees in any one (1) calendar year selected by the Union will be allowed up to eighty (80) hours off from their regular scheduled shift each to attend a state, regional or national convention subject to the operational needs of the plant. If other employees request to use vacation time to attend such conventions, the Company shall make reasonable efforts to accommodate the employee subject to operational needs and the Company's obligations under Article X, Section 6. The employee shall be guaranteed his former position without loss of seniority so long as he returns to work at the end of the leave.

## Section 8:  Bulletin Boards

The Company will provide one bulletin board for use by the Union located (1) in the hall by the main locker room, (2) in the office area of the coal yard, (3) in a mutually acceptable work area in the warehouse, (4) in the hall between support systems and the chemical lab, and (5) in the power block control room area.

## ARTICLE II - SCOPE AND PURPOSE
### Section 1:  General

A.   The Company and the Union recognize that the Company is engaged in a public service requiring continuous operation, and that the welfare of the public is dependent on such operation.

The Union, its officers and members and the Company agree that they will individually and collectively continue to promote the welfare of the Company in the performance of its public utility responsibility by efficient work and loyal cooperative support.

B.   The purpose of this Agreement is to promote the continuance of harmonious relations and collective bargaining between the Company and the employees covered herein, and to that end maintain satisfactory working conditions and rates of pay for all such employees.

C.   It is recognized that each employee is responsible for assisting management in attaining the best available plant performance in regard to reliability, efficiency and safety. This responsibility includes observing and reporting apparent equipment malfunctions, inefficient operations and unsafe conditions. Further, each employee is expected to perform his or her job duties in a conscientious manner and to make appropriate suggestions for improvements in plant performance and safety.

6

## Section 2: Scope

This Agreement constitutes the entire agreement between the Company and the Union. The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of those rights and opportunities are set forth in this Agreement. Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right to bargain collectively with respect to any subject or matter not specifically referred to in this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated this Agreement.

## Section 3:  Standards

The Union has been supplied copies of the Company's written personnel practices, policies and procedures and plant practices and procedures and accepts same except as expressly modified by this agreement. Should the Company desire to eliminate or modify any of same in such a fashion that it will have an adverse monetary effect on employees, the Company shall first notify the Union and, upon request, discuss same. In the event no agreement is made within five (5) working days, the Company may eliminate or make the

7

modification. When such an elimination or modification occurs, the Union shall have recourse to Article III except that the elimination or modification shall be deemed proper unless the Union proves the action was not for a legitimate business reason.

The employees covered by this Agreement are entitled only to those certain aspects of wages, hours and working conditions which are specifically covered by this Agreement. All other aspects of wages, hours or working conditions which were in effect prior to the entering into this Agreement and which are not covered by this Agreement, may with prior notice to the Union be continued or discontinued without consultation with the Union.

### Section 4: Savings Clause

If any part of this Agreement is, or is hereafter found to be, in contravention of the laws or regulations of the United States or of any state having jurisdiction, such part shall be superseded by the appropriate provisions of such law or regulation so long as the same is in effect, but all other provisions of this Agreement shall continue in full force and effect.

## ARTICLE III - GRIEVANCE AND ARBITRATION

### Section 1: Grievance

A grievance is defined as any difference between the Company and any employee or the Union involving the

8

interpretation or application of the provisions of this Agreement, or a claim of a violation of this Agreement.

## Section 2:  Grievance Procedure

Whenever a grievance arises between the Company and the employee(s) or the Union, the matter will be handled in accordance with the following procedure. For the purpose of counting, the first day is the day following the day on which the act, response or meeting occurred.

Step 1:  Within seven (7) calendar days after the act or occurrence which gives rise to the grievance, the grievance must be reduced to writing and signed by the employee and presented to his immediate supervisor, or his designee.

The written grievance must include:

a.    A statement of the grievance;

b.    The remedy requested;

c.    The article a nd section of the agreement, if any, which grievant claims has been violated.

Within seven (7) calendar days of presentation of the written, signed grievance, the employee's supervisor, or his designee, and one representative of the Union shall meet and/or discuss the grievance. The Company will deliver its response to the Union within seven (7) calendar days of the Step 1 meeting.

Step 2:  If the grievance is not settled in Step 1 above,

9

within five (5) calendar days of receipt of the Company's response in Step 1, the Union shall deliver to the Company, in writing, notice of its appeal of the grievance to Step 2. Within seven (7) calendar days of the delivery of the written notice of appeal to Step 2, the Union and the Company shall meet and/or discuss the grievance. The Company shall respond in writing within seven (7) calendar days after the meeting or discussion.

Failure of the parties to meet to discuss the grievance within the time provided in Steps 1 and 2 of the grievance procedure or failure of the Company to respond at any step shall be deemed a denial of the grievance and require the Union to proceed to the next Step within the time limits just as if the Company had denied the grievance in writing. Failure of the Company to respond or to explain its response at any Step shall not in any way restrict the Company's right to raise any issue or present any evidence it deems appropriate in support of its position in any subsequent arbitration or other administrative or judicial proceedings.

### Section 2(A): Mediation of Non-Discharge Grievances Prior to Arbitration

Grievances that do not involve discharge shall not be subject to arbitration except as provided in subsection D below, but at the request of the Union or the Company shall be subject to mediation as follows.

A.   The request for mediation shall be made within

10

fourteen (14) calendar days of the response of the Company under Step 2 above, or the day after the Company could have responded under Step 2, whichever first occurs.

B.   Upon the filing of a request for mediation, the party requesting mediation shall notify the Federal Mediation & Conciliation Service (FMCS) and make arrangements with the mediator and the other party for a mediation conference at a mutually acceptable date, time and place. The Mediator shall be rotated.

C.   The mediator shall conduct an informal meeting at which each party shall be entitled to explain its position as well as present witnesses and other evidence in support of its position. The rules of evidence shall not apply. The mediator may also, if he wishes, attempt to resolve the matter by discussing the grievance separately with the parties. If the mediator is unsuccessful in resolving the grievance, the mediator shall recommend the grievance be sustained or denied. In the event the mediator recommends that the grievance should be sustained, the mediator shall also recommend whether the remedy sought by the Union is appropriate under this Agreement. The mediator's recommendation shall be in writing and shall be made within thirty (30) calendar days after the

11

close of the mediation meeting.

D.   If the mediator recommends the grievance requested by the Union be sustained and the Company refuses to accept his recommendation, the grievance shall be subjected to arbitration as provided in Sections 3 through 9 below, upon the request of either party within twenty (20) calendar days of receipt of written notice of the Company's rejection. If the mediator recommends the grievance be denied, the grievance shall be subject to arbitration as provided in Section 3-9 below upon the request of either party within twenty (20) calendar days of the receipt of the mediator's written recommendation. In the event of arbitration, the mediator's recommendations shall not be admissible without the agreement of both parties, and the arbitrator shall consider the grievance de novo.

E.   The fee and expenses of the mediator shall be borne equally by the parties.

## Section 3:  Arbitration

Except as otherwise provided, any signed, written, arbitrable grievance which is not settled pursuant to Section 2 or 2(A) above, shall be submitted to binding arbitration. Arbitration proceedings must be initiated by the serving of a written request for arbitration by the Union or the

12

Company within twenty (20) calendar days of the response of the Company in Section 2, Step 2 above; or, in the case of a non-disciplinary grievance, within the time set forth in Section 2(A), subparagraph E above.

### Section 4:  Selection of the Arbitrator

A.  Upon the filing of a request for arbitration, the party requesting arbitration shall notify the arbitrator next in line under paragraph B and make arrangements with the arbitrator and the other party for an arbitration proceeding at a mutually acceptable date, time and place.

B.  The panel of arbitrators shall be Roger Abrams, Arvid Anderson, George Bennett, and William Lambert. Arbitrators shall be rotated in the order set forth above.

C.  Subject to Section 5, the arbitrator selected shall decide the dispute and such decision shall be final and binding on the parties and the employees. The arbitrator's fees and expenses will be paid by the losing party. If the grievance is sustained, the Company shall be deemed the loser. If the grievance is denied, the Union shall be deemed the loser. If the grievance is sustained in part and denied in part, the expenses of the arbitrator shall be borne equally among the parties.

D.  Each party shall be responsible for its own

13

attorney's fees, court reporting services it wishes to use, the wages of employees, whether they be witnesses, potential witnesses, representatives, or grievant, it utilizes in any arbitration proceeding.

## Section 5:  Authority of the Arbitrator

The arbitrator shall, in no way, alter, amend or modify the terms of this agreement. Under no circumstances may an arbitrator award back wages or monetary relief to any employee for a period prior to the act or occurrence which gave rise to the grievance and in any event no more than seven (7) days before the grievance was raised with the employee's supervisor under Section 2, Step 1 above. No relief may be granted to any employee who has not timely filed a signed, written grievance as required by Section 2 above. The arbitrator may not consider more than one (1) grievance without the agreement of both parties.

## Section 6:  Decision

The decision of the arbitrator shall be supported by substantial evidence on the record as a whole and shall be final and binding on the employees, Company and Union.

## Section 7:  Time Limits

The time limits set forth in Sections 2, 2(A) and 3 are to be considered of the essence of the grievance and arbitration procedure and failure of the employee or the Union to meet any time limit set forth therein shall be irrebuttably and conclusively deemed to constitute waiver of the grievance

and acceptance of the Company's position. The time limits in Sections 2, 2(A) and 3 may be extended in writing by mutual consent of the parties.

### Section 8:  Time/Pay

A.  Steps 1 and 2 of the grievance procedure shall be carried out during the grievant's non-working hours, except if the Company, at its option, elects to carry out one or both steps during working hours, in which event the grievant shall lose no pay.

B.  When the Company schedules a grievance meeting in Steps 1 or 2 during the regularly scheduled shift of the department or area steward, that steward shall not lose pay for his regular shift hours spent at the meeting. If such meeting is scheduled immediately before or immediately after that steward's regular shift, he shall not be paid. The steward or Local Union officer assigned shall attend meetings held during his shift or immediately before or after his shift and there shall be no substitution without the prior agreement of the Company unless he is absent from work that day. When a meeting is scheduled at a time other than during or immediately before or after his regular shift or he is absent from work, the Union may appoint a substitute steward or Local Union officer whose right to pay shall be determined just as if he had been originally assigned to handle the grievance by the Union.

C.  Other than as set forth in subsections A and B

15

above, the Company shall not be responsible to pay any steward or Local Union officer or employee for time spent investigating or processing grievances but will allow one steward per grievance reasonable time off without pay for such activities upon request made to his immediate supervisor, which request will not be unreasonably denied except for operational reasons.

## Section 9:  Limitations

The party referring a grievance to arbitration shall have the obligation of going forward with its case before the other party shall be required to present its case or adduce any testimony, except the Company shall be obligated to go first in discharge cases; provided, however, in cases of discharge under Article VI, Section 4(a)(6) the employee shall have the burden of proving that the work he refused to perform constituted a safety hazard.

## Section 10:  Precedent

In order to encourage prompt resolution of grievances, agreements and compromises of grievances made under Sections 2, 2(A) and 3 shall not be cited by either party as precedent in any subsequent arbitration proceeding without the consent of the other party.

## Section 11:  Withdrawal

Absent a mutual settlement of a grievance which has been appealed to arbitration under Section 2(A) or 3, withdrawal of a grievance shall result in any cancellation fee

of the arbitrator being paid by the party who initially filed and later withdrew the grievance.

### Section 12:  Review

In consideration for the job security agreements made in Article XVII, Section 1(A), (B), and (C), except for claims of violations of Article XVII, Section 1, (A-C and E), all decisions and actions under Article XVII, Section 1 [Bargaining Unit Jobs]; Article XVI, Section 1 [Bargaining Unit Work]; Article  XVI, Section 2 [Subcontracting]; Article XVII, Section 3 [Multi-crafting]; and, Article XI, Section 10(B)(1)(C)(D) and (E) are reserved exclusively to management and shall not be subject to review under Article III, or otherwise, unless a specific paragraph expressly so provides.

## ARTICLE IV - MANAGEMENT RIGHTS

### Section 1:  General

Any and all rights, powers, privileges, prerogatives and authorities, whether exercised or not, which the Company had or possessed prior to its having recognized the Union, or prior to its having entered into contractual relations with the Union, are retained and reserved to the Company unless those rights are specifically and expressly abridged by this Agreement.

The management of the plant and the direction of its work force, including but not limited to the exclusive rights

17

to determine whether all or any part of the operations covered by this Agreement shall commence, cease, continue, reduce or increase operations; to remove the operation or any part thereof to any location; to establish new jobs; to increase or decrease the number of jobs or employees; to change materials, processes, products, service, equipment, production and work schedules, and methods of operation; to introduce new materials, equipment, service or facilities; to assign work to be performed; to require employees to work overtime; to set the work schedules; to transfer employees from job to job on a temporary basis; to direct the work of the employees covered by this Agreement; to maintain, enforce, rescind or change personnel policies, procedures and rules, plant practices, operations and service guides and other operational procedures, policies and guides not inconsistent with this Agreement; to establish the standards of conduct and work of employees; to establish or change production standards; to lay off, discharge, or otherwise release employees from duty for lack of work or for other legitimate reasons; to establish requirements for employment; to promote and demote and to be the sole judge of applicants for employment shall be vested exclusively in the Company except where such rights are specifically and particularly abridged by the express terms of this Agreement.

## Section 2:  Work Rules

The Company shall have the right to establish,

18

maintain, enforce, rescind, amend or change work rules and regulations, it being understood and agreed that such rules and regulations shall not be in conflict with any provisions of this Agreement.

The Union has reviewed the Company's current work rules. In the event the Company amends or changes said work rules or adds new work rules, the Company will send the Union a copy of said amendment or new rule. Should the Union contend that the amendment or new rule is unreasonable, it shall have the right to submit same to Article III. In any such proceeding, the rule shall be deemed reasonable if the Company establishes it has a reasonable relation to legitimate operational needs.

Employees violating the Company's rules and regulations may be disciplined up to and including discharge.

## ARTICLE V - STRIKES

### Section 1:  Purpose
It is the intent of the parties hereto that the economic hardship and strife of the strike and picket line be avoided during the life of this Agreement. It is further the intent of the parties that the Company may have full and immediate resort to the courts to secure the enforcement of this Article and the parties specifically agree that any violation of said Article would and will cause the Company irreparable injury.

19

## Section 2:  No Strikes/No Lockouts

The Union and the employees agree upon consideration of the mutual undertakings set forth that during the life of this Agreement there shall not be any strikes or picketing of any kind or degree whatsoever, nor will there be any walkout, slow-down or other total or partial interference with or stopping of the Company's operations at any location for any reason by the Union or by any of the employees covered by this Agreement, such reasons including reasons not subject to Article III herein. The Union and the employees further agree that during the term of this Agreement neither it nor the employees will refuse to cross any picket line at any location whether or not owned by the Company, where the Company does business regardless of the reason for the picket line or the identity of the entity being picketed. The Company agrees there will be no lockouts during the term of this Agreement; however, a layoff for business reasons shall not be considered a lockout.

## Section 3:  Union Responsibility

Should this clause be violated by the employees covered by this Agreement or the Union, the Company may exercise any and all of the legal rights to which it is entitled. The Unions agree that in the event of a violation of Section 2, they shall take all reasonable efforts to stop such violations.

## ARTICLE VI - DISCIPLINE

20

## Section 1:  Probationary Employees

The Company shall have the unquestioned right to discipline or discharge any probationary employee during the initial probationary period for any reason and any such action shall not be subject to Article III.

## Section 2:  Types of Discipline

The Company recognizes the following types of disciplinary actions:

(a)  Oral reminder

(b)  Written reminder

(c)  Suspension without pay

(d)  Transfer

(e)  Probation

(f)  Demotion

(g)  Suspension with pay (Decision Making Leave - DML)

(h)  Combination of the above

(i)  Discharge

## Section 3:  Discipline Other Than Discharge

Employees may be disciplined by oral reminder, written reminder, suspension with pay, suspension without pay, transfer, demotion or combinations thereof for any action or

21

failure to act which in the opinion of the Company adversely affects the ability of the employee and/or fellow employees to efficiently perform their job responsibilities and/or adversely affects the efficient operations of the Company.

## Section 4:  Discharge

(a)   Employees who have successfully completed their probationary period may be disciplined up to and including discharge for any of the following reasons or for any other just cause:

1.   Incompetency or inefficiency in the performance of duties as determined by the Director of Plant Operations subject to his investigation.

2.   Possession, use, sale, attempt to sell or procure illegal controlled or other controlled substances at any time; or, possession, use, sale or attempt to sell or procure alcoholic beverages while on duty, on Company property or while operating or riding in or on Company equipment.

3.   Reporting to work under or while on duty being under the influence of illegal controlled substances or alcoholic beverages.

4.   Failure to follow reasonable instructions from a supervisor or other insubordination subject to review by the Director of Plant Operations.

5.   Refusal to fully and truthfully cooperate in an

22

investigation conducted by or at the direction of the Company in matters that affect the Company's business.

6. Interfering with the work of other employees or refusal to perform assigned work unless performance constitutes a safety hazard; provided further, that disciplinary action shall not take place until the assignment has been reviewed by the Director of Plant Operations, or his designee.

7. Unauthorized absenteeism or excessive tardiness.

8. Unauthorized use of Company vehicles.

9. Carelessness and/or negligence in the handling or control of Company property, or the improper appropriation of Company property.

10. Discourteous, insulting, abusive or inflammatory language or conduct toward the public, a fellow employee or employees as determined by the Director of Plant Operations subject to his investigation.

11. Improper absence from duty without authority.

12. Unauthorized communication of vital or confidential information to persons not employed by the Company.

13. On or off the job conduct which adversely affects

23

the ability of the employee to perform his/her duties and/or the duties of other employees and/or adversely affects the efficient operation of the Company.

14. Falsification of any document or any other dishonesty connected with the employee's duties or employment or in any way related to the operation of Company business.

15. Unauthorized possession of firearms or other weapons while on Company property.

16. Horseplay, fighting, unsafe conduct or other misconduct while on duty or on Company property.

17. Violation of a posted or otherwise known safety, operating, maintenance or other Company rule or policy.

18. Any fraudulent, criminal or dishonest act(s) committed acting alone or in collusion with others, including but not limited to stealing, embezzlement, extortion, assault or vandalism committed on the job or which adversely affects or could reasonably be expected to adversely affect the Company's business.

19. Improper racial or sexual comments, harassment or acts as determined by the Director of Plant

Operations subject to his investigation.

20. Engaging in any act prohibited by Article V, Section 2 of this Agreement.

21. Abuse of sick leave.

22. Committing the Company to expenses not within the authority of the employee.

23. Excessive garnishments to the extent allowed by law.

## Section 5:  Arbitration

When any employee has been disciplined for one or more of the specifically enumerated reasons set forth in Section 4 above, and said discipline is subjected to Article III, the Arbitrator shall deny the grievance if he is satisfied by a preponderance of the evidence that the employee violated one or more or the specifically enumerated reasons for discipline in Section 4.

## Section 6:  Witness

When an employee has a reasonable basis to believe that a scheduled meeting with a member of management will involve possible personal discipline of himself, he may request a fellow employee who, at his option, may be a steward or Local Union officer, be present as a witness. In the event no interview is to be conducted or the management official advises that the meeting will not involve possible personal discipline of the employee, the witness shall leave

25

the meeting. The witness may act as an observer and the employee may consult with the witness; however, the witness shall have no other role and shall not in any way impede the interview.

### Section 7: Notice
The Company shall provide any employee disciplined with a documented oral reminder, written reminder or greater discipline with a copy of the disciplinary notice. With written consent from the employee, the Company shall also provide the Union a copy of the disciplinary notice.

### Section 8: Removal
Upon request by the employee, oral and written reminders will be removed from the employee's personnel file if the employee has not received any oral or written reminder or more severe discipline for a period of one (1) year, or more. Whether removed or not, an oral and written reminder will not be considered in any subsequent disciplinary action if the employee has not received any oral or written reminders or more severe disciplinary action for one (1) year, or more, before the date of the subsequent discipline.

## ARTICLE VII - SENIORITY

### Section 1: Probationary Period
A newly hired employee will be considered a probationary employee for the first one hundred eighty

(180) calendar days of employment, and may be discharged for any reason whatsoever without recourse to the grievance or arbitration procedure of this agreement. Nothing herein prohibits a probationary employee from seeking Union membership during this period. After successful completion of his probationary period, the employee shall be placed on the seniority list as of his date of hire.

### Section 2:  Company Seniority

Company seniority shall be time of continuous service as an employee of Seminole Electric Cooperative, Inc. Employees will not be placed on the seniority list until they have successfully completed their probationary period, at which time they shall be placed on the list as of their date of hire.

### Section 3:  Job Seniority

Job seniority shall be calculated based upon years and months on the active payroll of the Company or on approved leave of absence by job classification; provided, however, only in the event an employee is downgraded within the same line of progression, seniority in the higher classification shall be carried into the lower classification.

### Section 4:  Loss of Seniority

Unless otherwise stated, an employee shall lose all accumulated seniority if:

(a)  He voluntarily quits with or without giving prior notice to the Company.

27

(b) He is discharged for just cause.

(c) He has been continuously laid off for a period of more than twelve (12) months.

(d) He fails to return to work from layoff within seventy-two (72) hours after notification to return to work by certified mail or telegram to his last known address in the Company's records.

In the event an employee who has lost his accumulated seniority is subsequently rehired by the Company, he shall be considered as a new employee for all purposes under this Agreement.

## Section 5:  Transfer/Promotion Within the Unit

When an employee is transferred (except for downgrades) or promoted to a different position within the bargaining unit, he shall be on probation for thirty (30) days during which time he may be removed therefrom and returned to his former or a position of like pay for any legitimate reason, including unsatisfactory performance; provided, however, the employee so removed shall have the right to submit same to the grievance and arbitration procedure but must establish that the Company had no legitimate reason for the removal. Upon successful completion of the probationary period, the seniority shall accumulate from the date of transfer or promotion. If prior to the end of said 30-day period the employee is removed to his former position, he shall be given job seniority credit for

28

the time spent in the job to which he was transferred or promoted.

## Section 6:  Transfer Out of Unit

At the option of the Company, employees transferred to positions outside the bargaining unit may re-enter the bargaining unit in their former or another position. If they are returned to their former or another position for job seniority purposes the period they worked outside the bargaining unit shall not be counted, but job seniority accumulated before the transfer shall be retained unless the employee is out of the bargaining unit more than one (1) year.

## Section 7:  Seniority List

In July and January of each year, the Company shall prepare and post two seniority lists for bargaining unit employees, one Company wide and one by job classification, and will provide the Union with a copy of same.

## Section 8:  Layoff

In any layoff, job seniority shall be determinative among employees of relatively equal qualifications and ability subject to the following:

(a)  The employee or employees laid off may bump into the next lower classification in the line of progression for their job (e.g., Master Mechanic, Mechanic, Utility Mechanic, General Utility), in which event he or they will

29

receive the rate of pay for the job into which they bump. Employees in the classifications of purchasing assistant, inventory tech. or planning assistant who would otherwise be laid off under this Agreement may bump the junior plant clerk based on Company seniority. They shall not be eligible to bump into any other classification.

(b) In the event such action causes a reduction in the number of employees in the classification into which the employee or employees bump within six (6) months, the Company shall select the employee or employees to be laid off from among the incumbents excluding those who bumped into the classification under subsection (a) above.

(c) In the event the Company decides to permanently fill a job from which an employee was laid off or bumped, the employee or employees laid off or bumped less than twenty-four (24) months before the layoff or bump shall be offered the job on a seniority basis subject to their continued physical, mental and technical qualification to perform the job; otherwise, such jobs shall be bid under Article VIII.

(d) The senior employee who disagrees with a decision in subsections (a), (b) and (c) above, may submit his position to Article III, but shall have the burden of establishing that the Company's action was arbitrary and unreasonable.

(e) Employees who bump under subsection (a) above shall be credited with job seniority previously accumulated

in that job, if any, in addition to that accumulated in the job classification from which he has been laid off.

(f)   In determining seniority for the purpose of determining bumping rights to the position of general utility or plant clerk, whichever applies, Company seniority within the bargaining unit shall apply.

## ARTICLE VIII - JOB BIDDING AND JOB PROGRESSION

### Section 1:  Job Bidding

In the event of a permanent vacancy in a job classification within the bargaining unit, the following procedure shall be followed:

(a)   The Company will post job classification vacancies within the bargaining unit for ten (10) working days on designated Company bulletin boards.

(b)   Employees who wish to be considered for an available position must apply within the posting period by completing a Job Application Form and turning it in to his supervisor and/or the Human Resources Department.

(c)   While an assignment is being made, the Company may temporarily assign any qualified employee to perform the work.

(d)   The Company will consider all timely applications

31

from qualified employees and fill the vacancy based upon:

(1) Qualification and ability to perform the job

(2) Work record

(3) Job seniority

Where factors 1 and 2 are relatively equal, job seniority shall be determinative.

(e) Where no qualified employee files a timely application for a posted job, the Company may fill the job from among other employees or from any other source.

(f) Where two (2) or more qualified employees apply, unsuccessful bargaining unit employees may file a grievance; provided all grievances except that of the senior bargaining unit employee shall be dismissed at the close of the time limit for filing a grievance. In determining the senior bargaining unit employee under this subsection, job seniority within the job progression shall apply. If no one having such job seniority filed a grievance, Company seniority shall apply. Should the senior bargaining unit employee officially withdraw his grievance by so notifying the Company at or before the Step 3 meeting provided for in Article III, upon written notice from the Union the

grievance of the next most senior bargaining unit employee whose grievance was dismissed and who still seeks the job shall be reinstated as if he were the original senior bargaining unit employee who filed a grievance. Such reinstatement shall occur only if the Union notifies the Company within seven (7) days after it receives notice of the withdrawal. This procedure will be permitted one time only, and no other applicant's grievance shall be considered.

(g) When the job is awarded, the Company will post the name of the successful bidder. The bargaining unit employee whose application is arbitrated pursuant to subsection (f) shall have the burden of proving his qualifications and ability were equal to or better than those of the employee selected. All other Company decisions under this Section may be subject to Article III, Section 2, but not Section 3.

## Section 2:  Job Progression

It is recognized that the Company utilizes a job progression step system within those job classifications identified in Appendices A, B,  and C except those with an asterisk beside them. Once an employee has met the minimum time requirements, he shall be considered for progression to the next step. Progression shall not be automatic but shall depend on job performance, satisfactory

33

completion of all required training programs, and work record. For legitimate operational reasons, or in recognition of other prior experience, the minimum time requirements may be waived in an individual case by the Director of Plant Operations.

### Section 3:  Wage Adjustment for Utility Classifications

Except for employees in permanent utility classifications, employees in the utility classification will be granted established step wage adjustments upon satisfactory, successful completion of the apprenticeship program requirements for movement to the next higher step, such satisfactory and successful completion to be determined by the Company.

### Section 4:  Bidding Out

Until they have completed the apprentice program:

(a)  Employees who enter an apprenticeship program after July 1 , 1 990, may not bid out of that apprenticeship program more than one (1) calendar year after they were assigned.

(b)  Employees who bid out within the limitations set forth above will have their bid considered on the same basis as any other employee who bids under this Article.

## ARTICLE IX - HOLIDAYS

34

## Section 1:  Recognized Holidays

The following days are recognized as holidays and observed on the day or date in parentheses unless otherwise provided in Section 2:

1.   New Year's Day (January 1)

2.   Memorial Day (4th Monday in May)

3.   Independence Day (July 4th)

4.   Labor Day (1st Monday in September)

5.   Thanksgiving Day (4th Thursday in November)

6.   Day after Thanksgiving (that day)

7.   Christmas Eve (December 24th)

8    Christmas (December 25th)

## Section 2:  Holidays Falling on Rest Days

(a) For all 8-hour regular shift employees on a Monday through Friday schedule:  whenever a recognized holiday falls on Saturday it will be observed on the previous Friday; whenever a recognized holiday falls on Sunday it will be observed on the following Monday.

(b) For all 10-hour regular shift employees:  whenever a recognized holiday falls on the first rest day it will be observed on the preceding day; whenever a recognized holiday falls on the last rest day it will be observed on the

35

following day except the day after Thanksgiving, Christmas Eve, when it falls on Sunday, and Christmas Day, when it falls on Friday, will be observed on the day that they actually occur (i.e., the recognized day).

(c)  For all rotating shift employees and for regular shift employees who normally work Saturdays and/or Sundays, holidays will be observed as the actual day that they occur (i.e., the recognized day).

(d)  When an observed holiday occurs on a scheduled rest day and the day is not worked, the Company will either: pay such employee for eight hours at his regular rate for such holiday or grant an alternate day off without the loss of his regular eight hours of pay. Request for such alternate day off must be submitted to the employee's supervisor at least seven days before the holiday and will be subject to approval based upon operational needs.

### Section 3:  Eligibility

In order to be eligible for holiday pay, an employee must have worked his scheduled shifts immediately before and after the holiday unless he is on vacation, approved sick leave or other approved leaves of absence. Employees will not be paid for holidays that fall during an approved unpaid leave of absence or any period of layoff or suspension without pay.

### Section 4:  Floating Holiday

In addition to the holidays listed in Section 1 above,

36

effective January 1, 1991, effective January 1, May 1 and July 1   each employee shall be entitled to one (1) personal/floating holiday each calendar year subject to the following conditions.

Employees shall make their request for a personal/floating holiday to their immediate supervisor. Subject to operational needs, such request shall be granted. Where two or more employees seek the same day off and operational needs will not allow all who have requested to be off, seniority shall prevail as among those who have made the request, except if management has already approved a requested day off, no changes will be made in behalf of a senior employee.

## Section 5:  Carryover

A personal/floating holiday may not be taken until after it is earned. All personal/floating holidays must be used in the year in which they are earned and may not be carried over to the next year.

37

# ARTICLE X - ANNUAL LEAVE

## Section 1:  Entitlement
Full-time regular employees shall be entitled to vacation pay based on years of continuous service with the Company, as follows:

After  1 year  -  10 days  (80 hours)

After  7 years -  15 days (120 hours)

After 10 years - 17 days (136 hours)

After 15 years - 18 days (144 hours)

After 17 years - 19 days (152 hours)

After 20 years - 20 days (160 hours)

## Section 2:  Policy
Company Policy No. 502 shall apply except as expressly modified by this Agreement.

## Section 3:  Pro Rata Vacation Pay
Upon termination, including retirement or resignation, employees shall be paid for annual leave earned but not taken; provided employees who voluntarily quit shall

receive no pro-rata vacation pay unless they have given the Company two (2) weeks written notice and worked their scheduled hours during that two (2) week period unless the absence is excused under the terms of this Agreement.

### Section 4:  Vacation Pay

(a)   The amount of pay for each day of vacation shall be based on eight (8) hours at the employee's straight-time rate in his regular classification.

(b)   In the event that a designated holiday provided for in Article IX, Section 1, should fall within an annual leave period, the day will not be charged against the employee's annual leave account.

### Section 5:  Carryover

A maximum of the number of hours annual leave an employee earned but did not use during the previous calendar year may be carried over to the next year. If the Company cancels an employee's scheduled vacation for operational reasons, and the employee requests but is not allowed to take the vacation before the end of the year, the employee may carry over to the next year all of the accrued vacation hours canceled without regard to the maximum limit; provided, however, he shall use the excess over the normal limit during the year to which the excess annual leave hours were carried over.

## Section 6: Scheduling

A.   The Company shall have the right to schedule vacations to ensure orderly operation of the plant. The use of annual leave requires the advance approval of the immediate supervisor and department head. Annual leaves in excess of three (3) continuous weeks shall require the General Manager's approval. In case two (2) or more employees request vacations for the same period of time, and the Company does not grant both requests, preference shall be given employees within the same job classification based first on job seniority, then on Company seniority.

B.   Operations Vacation Schedules

Employees on rotating shifts shall schedule vacation in accordance with applicable plant practice except as follows:

1.   The employee's vacation will be required to be scheduled as follows:

(a)   The employee must request vacation in writing no less than five (5) calendar days in advance of the beginning of the week the vacation is requested; provided, a request for vacation made after the time provided herein will be considered and may be granted if the Company determines the employee's absence will not affect operations.

(b)   The Company will approve or disapprove the

considered a guarantee of any hours of work per week or day and employees shall be paid only for those hours actually worked unless expressly elsewhere provided herein. For regular work periods or shift operations that do not end at midnight, the work week shall end with the shift nearest to midnight on Friday and the succeeding work week shall begin immediately thereafter.

## Section 3:  Designation of Shift

Rotating shift employees are employees whose shifts normally rotate weekly or on some other periodic regular basis. Regular shift employees are employees who normally work the same shift each week. It is recognized that on the effective date of this Agreement the employees in the electrical maintenance, mechanical maintenance, I and C, chemical laboratory, warehouse, substation, relay, general utilities departments and plant clerks included in the bargaining unit in NLRB Case No. 12-RC-7563 were regular shift employees; however, it is agreed that nothing herein shall prohibit the Company from changing the scheduled hours or days of work for regular shift employees or establishing new, back or additional shifts.

If the Company establishes a permanent new, back or additional shift, or establishes a shift for an outage scheduled more than thirty (30) days in advance of more than ten (10) calendar days, it shall post a notice of the number and type job classifications on the shift. Employees may request a transfer to a position within their job

43

classification. Subject to operational needs, the Company will assign the most senior employee from that job classification who requests a transfer who has the necessary qualifications and skills. If the shift is not filled under the above procedure, the Company may assign, consistent with operational needs, the least senior employee in the job classification who has the necessary qualifications and skills, or fill the position from any other source. This procedure shall not apply to any other job or shift assignments.

### Section 3(A):  Schedule Changes

The Company agrees not to change an employee's regular schedule more than one time in a workweek. A schedule change shall not mean overtime assignments. One schedule change includes whatever changes are made in the regular scheduled non-overtime hours in one notice of schedule change and may be for one or more days during the workweek; provided, the Company agrees not to change the regular schedule for an employee normally working day shift or evening shift to the midnight shift or vice versa more than one time per workweek. (For example, a day shift employee may be scheduled to work Monday days, Tuesday evenings, Wednesday days, Thursday evenings, and Friday days and the hours of the shift may be changed as well so long as all of the changes are included in the one notice of schedule change. On the other hand, an employee on days and evenings may only be changed to midnights once during

44

the workweek and vice versa). Schedule changes shall be made by seniority within the job classification among employees with the necessary skills and qualifications to perform the work who request the schedule change; otherwise the least senior employee in the job classification who has the necessary qualifications and skills to perform the work will be assigned.

### Section 4:  Prior Notice and Consultation

The Company shall notify the Union and upon request consult with the Union, prior to taking action concerning any group of employees under Sections 2 and 3 above.

### Section 5:  Meal Breaks

Rotating shift employees shall be allowed to eat while on duty if operational conditions permit. Regular shift employees will be assigned a thirty (30) minute unpaid meal break which shall begin not more than thirty (30) minutes before nor one (1) hour after the midpoint of their shift.

### Section 6:  Overtime

Work performed over forty (40) hours in one work week or eight (8) hours or ten (10) hours a day (depending whether employee is on 4 or 5 day work week) by any employee shall be paid for at the rate of one and one-half (1½ ) times the employee's normal straight-time hourly rate. Should the Company establish a normal work day made up of over ten (10) hours, daily overtime shall be paid for all hours over the normal work day. No hours will be counted

45

for determining entitlement to overtime except hours actually worked, paid time off or approved absence without pay under Company policy unless specifically otherwise provided in this Agreement.

## Section 7:  Premiums

In addition, the following hours shall be compensated on an overtime basis at the rate of one and one-half ($1\frac{1}{2}$) times the employee's regular straight-time rate:

1. All work on holidays recognized in the Agreement or on scheduled days off; except that after July 1, 1990, work on Christmas and Thanksgiving, and after July 1, 1991, work on Christmas, Christmas Eve, New Year's Day and Thanksgiving shall be at two (2) times the employees regular straight-time rate.

2. All off-schedule hours, including all work in the next twenty-four (24) hours following the change of schedule where twenty-four (24) hours advance notice of the change of schedule is not given.

All work after sixteen (16) consecutive hours exclusive of meal breaks shall be paid at double the employee's hourly rate.

It is not the intent of the parties to compensate an employee on a premium basis for working their normal scheduled work day.

46

## Section 8:  Duplication

There shall be no duplication and/or pyramiding of overtime and/or other premium pay under the terms of this Agreement.

## Section 9:  Call-Out Pay

Call-out is when an employee is assigned by the Company to perform unscheduled work prior to or after his regularly scheduled shift.

    (a)  The employee will not be paid for travel time to and from the normal work location.

    (b)  However, if the employee is asked to report to a work location that is not the normal work location, the Company would be required to compensate the employee for the travel time in excess of the normal travel time at the applicable rate of pay.

    (c)  An employee called out by the Company will receive a minimum of three (3) hours pay at the applicable rate.

## Section 10:  Assignment of Overtime

A.  The Company shall have the right to assign overtime to those employees best qualified to perform the work subject to operational considerations, including but not limited to continuation of work in progress, emergencies and special skill requirements of work to be performed.

47

Employees shall not be required to work in excess of sixteen (16) consecutive hours except in the case of an extreme emergency.

B.   Other than as provided in subsection (A) above:

(1)   The Company will determine the number of employees in each classification it needs to have on-call for a one (1) week period and post the overtime schedule requirements on the bulletin boards not less than one (1) week before the schedule becomes effective.

(2)   By classification, employees may voluntarily sign up on the schedule for the one-week period.

(3)   If the number of employees in each classification that is posted on the on-call schedule for the week is not filled by volunteers signing up, the additional employees needed for the one-week period will be filled by inverse seniority from among all of the employees in the classification on a rotation basis. The employees so assigned will be "on-call" as provided in subsection (4) for the week. [For example, if there are ten Mechanics and the Company determines that three mechanics are needed "on-call" for a one-week period, and only one signs up as a

48

volunteer, the two least senior Mechanics will be assigned to the on-call list for the one-week period. Similarly, for the next one-week period, if the Company determines that three Mechanics are needed to be on-call, and one Mechanic volunteers, the next two least senior employees will be assigned to the on-call list for the next one-week period. There shall be no effort to equalize unscheduled overtime as among employees in the same classification and employees will work whatever overtime is assigned to them during the week or weeks they are on "on-call"].

(4) Volunteers for and employees assigned overtime pursuant to subsection (2) and (3) above will carry beepers which shall be provided by the Company during the period they are on-call. Carrying the beeper shall not be considered hours of work for compensation purposes, however, when employees are called in and report to work, they shall be paid in accordance with the Collective Bargaining Agreement.

(5) Volunteers for the week will be called first based on the voluntary overtime hours worked as a continuous volunteer for overtime with the employee being called based on the lowest

49

number of continuous voluntary overtime hours.

(6) If there is more work than the volunteers can perform, the other employees will then be called in in rotating order without regard to the overtime hours worked.

(7) Employees who are assigned a beeper, whether they be volunteers or assigned employees, shall respond to the beeper call by telephone not more than 20 minutes after they are beeped and report to the Plant as assigned unless the employee has an excuse acceptable to the Company. Employees who violate this subsection shall be disciplined pursuant to the applicable Company policies, practices and procedures.

(8) If the volunteer and assigned employees for the week are insufficient to cover the work to be performed, the Company shall assign overtime utilizing first any volunteers not assigned beepers and then from all other employees in the classification on the same basis as provided in subsections 5 and 6 above.

(9) The Company reserves the right to eliminate the beeper system with seven (7) calendar

50

day's notice and assign unscheduled overtime consistent with the other provisions of this Section.

C.   The parties beeper agreement not withstanding, so long as manning in bargaining unit is maintained as described in Article XVII, Section 1(A), only the Company shall determine whether overtime work will be assigned to employees already on shift without regard to their classification, the GMC or other contractors, non-bargaining unit employees or call-out bargaining unit employees under paragraph B above; provided:

(1)   Employees who are assigned a beeper for a week or less and who respond to all call-outs made to them, if any, in a timely fashion will be paid one hundred dollars ($100.00) if assigned for a full week, but if assigned for less than a week will be paid twelve dollars ($12.00) for each day assigned that falls in their regularly scheduled work week and twenty dollars ($20.00) for an off day assigned or a holiday assigned recognized by this Agreement.

(2)   Overtime assignments to perform overtime work regularly performed by bargaining unit employees shall not be made to supervisors

51

other than those enumerated in Article XVI, Section 1 who are on the plant site, except under the provisions of Article XVI, Section 1(A).

D. When the Company determines it has adequate coverage from multi-craft employees to meet all of its operational needs, it will notify the Union in writing and upon the effective date provided in the notice paragraph B, the beeper agreement and paragraph C(1) shall no longer apply. After said effective date, the Company may continue to assign beepers consistent with Section 1 0(A) to employees who volunteer to carry them.

E. Employees who volunteer to carry beepers in accordance with subparagraph (D) above shall carry the beepers when off-duty during the period they are assigned a beeper and respond to the beeper call as directed.

## Section 11: Backshift

The Company agrees to eliminate the afternoon backshift subject to the following conditions:

(a) The afternoon backshift will be eliminated not later than the first Monday forty-five (45) days after the collective bargaining agreement is executed by both parties, and the initial rebidding and staffing shall be completed in accordance with the terms of

this agreement. Subject to the applicable provisions of the agreement, grievances may be filed over the staffing selections and processed through Step 2; however, such grievances shall not be subject to arbitration without the written consent of the Company.

(b) At the option of the Company, the afternoon backshift may be reinstated at any time with thirty (30) calendar day's notice.

(c) If the Company reinstates the afternoon backshifts or permanently increases the number of personnel on the midnight shift, the beeper system provided for in Section 10 above shall be eliminated unless the parties mutually agree otherwise; provided, however, regardless of whether the beeper system is continued by mutual agreement subsections (a) and (b) 1-3, 5, 6, 8 and 9 of Section 10 shall remain in effect; should an adequate number of volunteer employees not be available, the Company will call other employees in the order of lowest seniority first. When employees are called in and report for work, they shall be paid in accordance with the Collective Bargaining Agreement. Employees who are called in shall report to the plant as assigned, unless the employees have an excuse acceptable to the Company. Employees who violate this subsection

53

shall be disciplined pursuant to the applicable Company policies, practices and procedures.

(d)   The Company agrees to eliminate the Saturday maintenance backshift so that the current Saturday backshift will work Monday through Friday instead of Tuesday through Saturday, provided however, subsections (b) and (c) above shall apply.

## Section 12:  Rest Periods

(a)   If an employee is required to work more than sixteen (16) consecutive hours, upon release from work by the supervisor the employee shall be granted an eight (8) hour rest period. Any part of the rest period which falls within the normal regularly scheduled working hours for that particular employee will be considered time worked and paid at the applicable rate.

(b)   If an employee has not been required to work sixteen (16) consecutive hours or more but has not been off duty for at least eight (8) consecutive hours during the fifteen (15) hours immediately preceding the beginning of the employee's regularly scheduled work period, the employee shall be allowed an eight (8) hour rest period upon release; provided, if after July 1, 1993, the Company puts in a twelve hour shift or shifts, the words "fifteen (15) hours" above shall be

54

automatically deleted from the subsection. In the event the twelve hour shift is thereafter eliminated, the words will be automatically reinstated.

(c) If a regular shift employee is called out during a period of time from seven and one-half (7½) to four and one-half (4½) hours before the employee's regularly scheduled shift and is released prior to the start of his regular shift, he may be given a rest period equal to the number of hours he worked, after which time he shall report to work and complete his regularly scheduled shift. If the employee is not released at the start of his regular shift, a rest period equal to the call-out hours worked prior to the beginning of his regularly scheduled shift may be granted prior to the end of his regularly scheduled shift. This rest period starts upon release from the call-out. Any part of the rest period which falls within the normal regular scheduled working hours will be paid at the straight-time rate.

(d) When the rest period extends into his regularly scheduled work day, the employee will be expected to report for work at the end of the rest period for the balance of his regularly scheduled work day unless specifically otherwise instructed.

(e) No additional time will be added to the rest period

55

for travel or meals.

(f)   Reasonable efforts shall be exercised by the supervisor to grant the rest period as provided herein. In the event of an emergency situation, however, the supervisor may delay the start of the rest period or may recall the employee back to work prior to the termination of the rest period. Hours worked in such rest period will be compensated at one and one-half (1½) times the employee's normal rate of pay.

## Section 13: Cancellation Without Notice

When the Company cancels scheduled overtime, it shall pay the employee three (3) hours pay at his straight-time rate unless the employee was notified of cancellation at least twelve (12) hours in advance of the time he was scheduled to report. Notice of cancellation may be made personally to the employee or by leaving a message with anyone who answers the telephone or a message machine at the employee's last known telephone number.

## ARTICLE XII - LEAVES OF ABSENCE

## Section 1: General Leaves

Leaves without pay are discouraged; however, at the Company's discretion, an employee who has used all accrued annual leave and floating holidays recognized in Article IX may be granted a leave of absence for good

reason without pay which in no event, except as altered by this Article, shall exceed thirty (30) days, unless voluntarily extended by the Company. An employee desiring such leave of absence shall make his request in writing to the Company and receive written permission from the Company for such leave prior to the commencing thereof. Failure to return from such leave or any extension granted by the Company shall entitle the Company to discharge the employee involved. An employee on leave of absence shall not accept employment elsewhere, venture into business himself or attend school unless previously agreed to by the Company. Any employee who falsely states the reason for his requested leave of absence shall be subject to discharge. Employees disciplined or discharged for violating this Section may submit said action to Article III but shall have the burden of proving they did not violate this Section.

### Section 2:  Jury Duty

An employee who is required to take leave to serve as a juror will be excused from work for the required period of time. All benefits and pay will continue, except any pay received from court duty will be deducted from the employee's pay.

The employee shall report back to work at all times when not actually engaged in performing the duties described above under the direction of the court.

### Section 3:  Military Leave

57

(a)  The Company and the Union shall comply with the Universal Military Service & Training Act.

(b)  Employees who are obliged to take periodic annual military training in the Armed Forces of the United States will be allowed such minimum leave as necessary for a period not to exceed two (2) weeks. During such leave, the Company will pay the employee an amount equal to the difference between his or her normal Company pay and military pay. If military pay exceeds normal Company pay, the employee will receive no compensation from the Company. Leave in excess of the two weeks period may be taken subject to the provisions of Section 1 above.

## Section 4:  Job Upon Return From Leave of Absence

Upon returning to work from an authorized leave of absence under this Article, an employee shall be entitled to the job he left, or a job similar to the one he left, unless such job or jobs have been eliminated or another employee has been permanently transferred to take over such job, or jobs, in which case the Company shall have the right to place the returning employee in any job which it deems him capable of performing.

## Section 5:  Emergencies

Subject to all other conditions of Section 1 above, upon

58

request, an employee may, in the Company's discretion, be granted leave without pay without first having used all accrued annual leave and taken all floating holidays, for a maximum of twenty-four (24) working hours one (1) time each calendar year when such absence is approved in advance and caused by a bona fide emergency or circumstance beyond the control of the employee which he could not reasonably be expected to have foreseen. Refusal of such requests may be subject to Article III, Section 2, but not Section 3.

## Section 6:  FMLA and ADA

The provisions of this Article shall be subject to the Family Medical Leave and Americans With Disabilities Acts.

## ARTICLE XIII - WAGES/SHIFT/WEEKEND DIFFERENTIAL

## Section 1:  General

During the life of this Agreement the wage rates for those job classifications set forth in Appendix A (effective July 1 , 1 999), Appendix B (effective July 1 , 2000), Appendix C (effective July 1, 2001), Appendix D (effective July 1, 2002), attached hereto and made a part hereof, shall apply except as modified in Section 3 below.

## Section 2:  Plant Clerks, Planning Assistant, and Purchasing Assistants

59

The job rates for the Plant Clerks, Planning Assistants, and Purchasing Assistants included in the bargaining unit, are as set forth in Appendices A, B, C and D.

In addition:

1.  Effective July 1, 1996, increase current employees by the general wage increase of 3.1% then place them in the second step above that rate as set forth above.

2.  Employees will progress within the steps in accordance with Article VIII, Section 2.

3.  Clerical employees who successfully bid into a higher paying clerical classification shall be placed in the step which provides a pay rate not less than the rate they were making in the job from which they successfully bid.

**Section 3:  Shift/Weekend Differential**

A.  Shift Differential--Sixty cents (60¢) per hour shall be added to the rates set forth in Appendices A, B, C and D for the regular scheduled hours of employees employed on the third shift and seventy-five cents (75¢) per hour shall be added to the rates set forth in those Appendices for the regular scheduled hours of employees employed on the first shift. Effective July 1, 2002, each shift differential will be increased by five cents (5¢) per hour.

60

B.   Weekend Differential--Fifty cents (50¢) per hour will be added to Operators hourly rate when scheduled hours of work fall on Saturday and/or Sunday as identified on his/her time sheet. Call-out and Beeper call-out will be paid at the Overtime rate with no differential and the meal allowance practice will be in effect. The differential will apply to call-ins, if scheduled with eight (8) hours or more notice and/or hold-overs, if scheduled prior to the beginning of the Operators shift and a meal allowance will not be due.

**Section 4:  Temporary Higher Classification (THC)**

A.   When an employee is temporarily assigned the principal duties of a classification other than his regular classification, he shall be paid his regular hourly rate or the regular hourly rate of the classification in which he is assigned, whichever is higher; provided, however, pay for work in a higher classification shall apply only when the employee is assigned for more than one (1) hour in a day, in which event the higher pay shall be for all hours worked that day in the higher classification.

B.   For THC assignments of more than one (1) day, seniority of qualified available employees on the same shift in the next lower progression along with the specific requirements of the particular job in question will be considered; however, all THC assignments shall be the sole responsibility of the Company.

61

C. THC assignments of more than six (6) continuous months will not be used to fill a permanent vacancy except for a legitimate operational reason; provided, nothing in this Agreement shall require the Company to fill a vacancy after the six (6) months or restrict the Company from filling it after six (6) months other than by THC.

## Section 5: Section 401(k) Plan

Effective than October 1, 1990, bargaining unit employees were placed on the same Section 401(k) Plan as the non-bargaining unit, non-exempt employees of the Company. Provided, further, the Company match and all other aspects of the Plan may be modified, increased or decreased during the life of this Agreement so long as bargaining unit employees are treated the same as non-bargaining unit employees.

## Section 6: Meal Allowance

The reasonable cost of meals when employees are required to work on an unscheduled basis prior to or beyond their shift under Company Personnel Practice No. 02-507-005, subsection 3.2 shall be ten dollars ($10.00) for all meals regardless of when the meal falls.

## Section 7: Master Supplement

When a master mechanic or master electrician is assigned to direct or lead a crew of three (3) or more employees of a sub-contractor for more than four (4) hours in a day, he shall be paid an additional fifty cents (50¢) per

hour for all hours he performed such work for that day.

# ARTICLE XIV - INSURANCE

## Section 1:  Coverage
Employees shall be covered by the health and medical insurance plans and dental insurance plans covering non-bargaining unit employees as of July 1, 1999.

Employees shall have the option of purchasing supplemental life insurance through payroll deduction from Seminole's existing provider, The Guardian Life Insurance Company of America, or other companies as may be selected by Seminole, covering non-bargaining unit employees as of July 1, 1999.

## Section 2:  Employee Contribution
In the event, after January 1, 1995, the carrier or the Board changes the benefits and/or premium contribution rates for employees and/or dependents for non-bargaining unit employees, the same changes shall apply at the same time and in the same manner to bargaining unit employees.

## Section 3:  Payroll Deduction
Election of dependant coverage by an employee shall authorize the Company to deduct the employee contribution from the employee's pay in the same fashion as such deductions are made from the pay of non-bargaining unit employees for such coverage.

63

## ARTICLE XV - RETIREMENT

Bargaining unit employees shall be covered by the Company retirement plan to the same extent and in the same fashion as all other non-supervisory Company employees.

## ARTICLE XVI - MISCELLANEOUS

### Section 1: Work by Non-Bargaining Unit Employees

A. It shall not be a violation of this Agreement for supervisors or other non-bargaining unit employees of the Company to perform work normally performed by employees covered by this contract in the case of testing, training, experimentation, new equipment, emergency, and other legitimate operational needs when no bargaining unit employee is readily available on site.

B. It is recognized that Control Room Operators, Support Control Operators, Lead Equipment Operators, Senior I & C Technicians, Senior Substation and Senior Relay Technicians are supervisors and the work that they perform or any reasonably related extension of their duties is not bargaining unit work; furthermore, they shall be entitled to otherwise perform work normally performed by bargaining unit employees.

C.  All Non-bargaining unit employees shall be allowed to assist bargaining unit clerical employees in the performance of their work, substitute for them when they are absent or on break and to perform work normally performed by them.

D.  In Operations, non-bargaining unit employees may perform all work at all times with the exception of clearance systems tagging or tag verification which can only be performed by bargaining unit employees except in the case of emergency, training or new equipment. This subparagraph D shall be subject to Article III.

## Section 2:  Subcontracting

The Company shall have the right to continue to contract out bargaining unit work consistent with its past practice. The Company shall otherwise have the right to contract out bargaining unit work so long as the minimum manning levels as described in Article XVII, Section 1(A), (B), and (C) are maintained.

## Section 3:  Searches

Employees entering or leaving the premises shall submit to a search of their vehicles and belongings upon request.

## Section 4:  Lockers, Desks, Etc.

Lockers are provided for the convenience of the

65

employees but remain the property of the Company. Employee lockers and desks are subject to inspection by the Company at any time for any reason and a Union representative shall be given the opportunity to be present except in cases of emergency.

### Section 5:  Call-Out - Recording

The Company may record and establish a procedure for recording telephone call-outs for employees as it deems necessary with five (5) or more days written notice to the Union.

### Section 6:  Gloves

The Company will provide one (1) pair of work gloves of its choice to each employee when such gloves are required as part of the job. The Company will replace the gloves only if the employee turns in the worn or torn pair; otherwise, work gloves are the responsibility of the employee.

### Section 7:  Sunglasses

Employees will be allowed to wear approved safety sunglasses when working outside in an uncovered area.

## ARTICLE XVII - JOB PROTECTION, MULTI-TASKING AND MULTI-CRAFTING

### Section 1:  Job Protection
### A.   Overall Job Security

Subject to the conditions set forth below, the Company

66

will not permanently reduce the number of jobs in the bargaining unit on-site as of December 31, 1996, while employing a GMC[1]; provided, however, a temporary reduction in the number of bargaining unit jobs while employing a GMC which is caused by an emergency as determined by the Company, or other condition beyond the control of the Company shall not be a violation of these commitments.

## B.   Downgrades

Employees will not be downgraded from a classification within their line of progression and the classification from which they were downgraded then assigned to the GMC; current[2] employees will be afforded the same protection against other contractors[3]. The protection in this subparagraph applies only to employees

---

1 The General Maintenance Contractor (GMC) under this paragraph means GMC Fluor Daniels only, or its successor, and only in the performance of general plant maintenance on a daily, weekly or regular basis under a contract (PMC) to perform such work for SECI. The intent of the parties is to insure job protection as provided in this paragraph only over against the GMC which had 53 employees on-site as of July 1, 1996. Successor shall mean another contractor who assumes all or part of the work performed by the GMC as of July 1, 1996. The GMC, or its successor, does not include any other contractor, any other type work, special projects, outages or the like.

[2] "Current" in this Agreement shall mean one of the 169 employees actively employed as of 7/1/96 but not their replacements. "New" in this Agreement shall mean employees hired after 7/1/96.

[3] "Other contractors" in this subparagraph B only shall mean only a contractor who is assigned to perform the normal daily routine work performed by bargaining unit employees as of July 1, 1996; it does not include any other contractor, any other type work, special projects, outages, or the like.

and not to the number of classifications or the number of employees within a classification. This subparagraph shall not apply to downgrades caused by technological change, economic conditions or any other reason except assignment to the GMC or another contractor as defined herein. Otherwise, downgrades shall be in accordance with this collective bargaining agreement.

## C.  Maintaining Bargaining Unit Positions

If vacancies in a bargaining unit job occur by attrition, which brings the bargaining unit below the manning provided in paragraph (A) above:

(1)  If the GMC has 53 or more employees on-site, the Company shall fill the vacancies as provided in 3 and 4 below.

(2)  If the GMC has less than 53 employees on-site, the Company shall have the right not to fill the vacancies provided it reduces or has already reduced the number of GMC employees on-site by one (1) for every one (1) bargaining unit vacancy it does not fill.

(3)  If the classification in which the vacancy occurs is a classification in which the GMC has employees on-site (e.g. Mechanic), the Company shall post and fill (a) the same classification, (b) another classification at the same entry level or higher, or (c) a multi-craft position.

(4)  If the classification in which the vacancy occurs is a classification in which the GMC does not have employees on-site (e.g. Electrician), the Company shall post and fill (a) the same classification, (b) another classification at the same entry level or higher, or (c) a multi-craft position.

## D.  Use of a Contractor

The Company shall have the right to utilize the GMC and other outside contractors in accordance with Article XVI, Section 2.

## E.  Transfer/Assignment

When an employee's position is scheduled to be eliminated, the Company shall have the right to assign the employee to be displaced to any bargaining unit position by mutual agreement between the Company and the Union in which case the position shall not be required to be filled under Article VIII. If no mutual agreement is reached, the employee placement shall be made in accordance with Article VII, Section 8. In the event of a job elimination, employees who successfully bump shall be paid the highest rate in the classification into which they bump.

## F.  Additional Staffing

Subject to paragraphs (A-C) above, the Company may:

(1)  Elect not to fill any job.

69

(2) Fill any job with bargaining unit employees, GMC or other contractor.

(3) Fully exercise its rights under this Agreement, including Article IV.

## Section 2:  Assignment Flexibility/Multi-Tasking

A.   The parties adopt the concept of assignment flexibility a/k/a multi-tasking. In so doing, it is not the intent of the parties that every employee be required to perform  every function of every classification, but that employees in one classification may be assigned work normally performed by other classifications to help out other employees in other classifications or to perform work in other classifications which they are capable of performing or which they may become capable of performing without substantial and detailed on-the-job training.

B.   Job assignment flexibility is not limited to a particular department, area or progression but only as provided in paragraph C below.

C.   While not all inclusive, the elements of assignment flexibility (multi-tasking) are explained in the example shown below and that concept supersedes any rule, commitment, understanding, practice, etc. that may have existed in the past or as may be contained elsewhere in this Agreement that is in

conflict with this assignment flexibility concept.

1. Employees in one craft may be assigned to help out employees in another craft or to perform work described in any of the levels of the Joint Apprenticeship Training Program (JATP) (currently eight levels) for the other craft or crafts. For example, a mechanic may be assigned to help out an electrician, I & C tech or operator or to perform work normally performed by them which is described or mentioned at any level of the JATP for an electrician, I & C tech or operator, depending on which type of work the mechanic is assigned to perform.

2. In the example above, it is not the intent to make a mechanic an electrician, I & C tech or operator or vice versa, but rather to have the mechanic continue his primary duty as a mechanic and fully utilize his skills, training and knowledge to perform work normally assigned to other classifications.

D. In the application of the above principles, it is understood that the employee must be able to perform the work safely.

E. In Operations, in the event the Company assigns an employee or employees to a multi-tasking project

71

on a shift different than their regular shift, the Company will assign the most senior qualified employee who requests the assignment from each of the shifts from which the Company draws employees to perform the multi-tasking project; otherwise the Company may assign the least senior employee from each shift who has the necessary qualifications and skills to perform the project.

F.  In the event an employee is assigned to perform a task outside the work normally performed in his classification, and in good faith does not believe that he can perform the task because he has not received sufficient training to do so, the employee shall not be required to perform that particular task until he is trained but shall fully cooperate in being trained how to perform said assignment. Once the employee has been trained to perform said task, he shall perform the task if later assigned to do so.

G.  The assignment of work to and as among employees in the bargaining unit, including but not limited to tasks not regularly assigned to or performed by a particular classification, is an exclusive management right and no decision or action in regard thereto shall be subject to review under Article III, or otherwise, except as provided in paragraph H below.

72

H. In the event an employee is disciplined up to and including discharge for refusing to perform a task not normally performed by his classification or for unsatisfactorily performing such task (each of which reasons shall be considered as specifically enumerated reasons under Article VI, Sections 4 and 5 just as if they were enumerated in Section 4) and in either case the employee was adequately trained, refused training or was capable without training of performing the assigned task:

1. The employee may grieve the discipline under Article III.

2. If the employee files a timely grievance under Article III and the discipline was less than termination of employment, the grievance shall not be processed further but shall be preserved except the Union and the Department Head, or his designee, at which the parties will fully explain their position, indicating the reason for the discipline and why the grievant refused, failed to perform satisfactorily and/or was inadequately trained, whichever is applicable. Upon the request of either party, the parties shall also exchange notes, if any, made before such meeting which are not protected by the attorney-client privilege.

73

3.   If the employee is discharged:

(a)   The employee may grieve and arbitrate his discharge under and subject to Article III.

(b)   The employee may contest any lesser form of discipline for prior related conduct over which he preserved by filing a timely grievance as provided in paragraph 2 above. Prior discipline not so preserved, shall be deemed admitted.

I.   At the request of the Union, the Cooperative will meet and consult with the Union concerning the administration of the assignment flexibility concept set forth in this paragraph.

## Section 3:  Multi-Craft

A.   During the life of this Agreement, the Cooperative shall have the right but not the obligation to create multi-craft positions.

B.   The multi-craft employees within the plant operations and maintenance shall be assigned to a rotating or fixed shift along with the other employees on the rotating or fixed shift.

C.   Current employees shall not be involuntarily transferred to a multi-craft position.

D.  When the Company decides to create a multi-craft position, it will post the job and indicate in the posting the primary craft as well as the secondary and/or tertiary craft to be covered by the multi-craft employee (<u>e.g</u>. primary craft - mechanic; secondary craft - electrician).

(1)  The Company shall determine whether the employees who bid the job meet the qualifications for the craft.

(2)  As among qualified bidders, positions will be filled in accordance with Article VIII, Section 1 of the CBA. The Company shall have the right, but not the obligation, to eliminate the successful bidder's position and filling the multi-craft position shall not increase the minimum manning under Article XVIII, Section 1(A). (<u>E.g</u>. if a current mechanic successfully bids or a new mechanic successfully bids or is involuntarily transferred to a multi-craft position, the minimum manning under Article XVII, Section 1(A) shall not increase and the Company shall have the right but not the obligation to eliminate the mechanic position.)

(3)  If no qualified employee successfully bids or no new employee is involuntarily transferred,

75

the Company may fill the position from any other source. In the event the multi-craft position is within the minimum staffing levels of Article XVII, Section 1(A), if it is filled by the transfer of a bargaining unit employee subparagraph 2 above will apply; but if it is not filled by the transfer of a bargaining unit employee and filling the multi-craft position within the bargaining unit results in manning above that provided in Article XVII, Section 1(A), the Company shall have the right but not the obligation to layoff a bargaining unit employee from the primary craft indicated in the posting. Employees may exercise their bumping rights as provided in Article VII, Section 8; provided, however, current employees only shall not be laid off or displaced from their job as a result of filling a multi-craft position. (E.g. Assume that because no BU employee successfully bid a mechanic (E) job, the Company did not elect to involuntarily assign a new employee to the position and a new employee was hired from outside. As a result, the number of employees went up to 170 and the mechanics went up from 40 to 41. Mechanics hired before 7/2/96, would not be laid off or removed from their mechanic position. Mechanics hired after

7/1/96 would have no protection as a mechanic and would be subject to layoff in accord with Article VII, Section 8.)

E.   The employees assigned to the multi-craft position shall learn the secondary and/or tertiary craft by working with the other craft or crafts on the job, through on the job training and by performing the tasks of the other crafts as they learn how to do so. They shall also be provided on the job training by the Company both "hands-on" and "classroom" as necessary to become qualified for the secondary or tertiary craft designation and pay.

F.   While the multi-craft employees are working evenings, midnight and weekend shifts, they may or may not be assisted by operations employees, employees called in for unscheduled overtime, contractors and other employees on the shift.

G.   Once an employee has obtained a multi-craft designation, the employee will be required to pass an annual proficiency test in each classification to maintain his designation and pay.

H.   Once assigned to a multi-craft position, the employee shall be paid a premium added to his current rate of pay of 2½% upon assignment to the multi-craft position, and an additional 2½% upon the successful completion of each of the three

77

levels of the multi-craft training program. Successful completion shall include passing a written and proficiency test, on job demonstration of proficiency in the secondary or tertiary craft. The same premiums shall be paid under the same conditions to a tertiary craft.

I.   Employees who successfully bid a multi-craft position, will be given up to one (1) year to complete each of the three (3) levels of the multi-craft training program providing management is satisfied with their progress during the year.

J.   Employees who do not successfully complete a level within one year or who are not satisfactorily progressing within a level but who are continuing to perform their primary craft satisfactorily will be moved back to their primary craft and relinquish multi-craft premium pay in the future.

K.   Multi-craft employees shall normally report to a supervisor in their primary craft and seniority shall be within their primary craft.

## ARTICLE XVIII - COMMITTEES

### Section 1: Apprentice Training

(a)   The parties recognize the need to continue an adequate Apprentice Training Program (ATP) for certain job classifications in the bargaining unit for the development of

78

qualified craftsmen. To that end, a Joint Apprentice Committee (JAC) is established.

(b)  The JAC shall be responsible to recommend to the Company courses and methods of instruction, procedures for administration and qualification standards for the ATP. The Company shall consider written recommendations submitted by the JAC.

(c)  The JAC shall include four (4) members, two (2) each contract year to be appointed by the Union and the Company. The Chair shall alternate between the Union and the Company committee members each contract year with a Union committee selectee serving the first term. The Committee shall meet upon call by the Chair which shall be no less often than once a calendar quarter. Employees attending such meetings shall lose no pay. The two (2) Union appointees shall not be changed more often than every six (6) months except for exceptional reasons (e.g., resignation, or termination of employment).

(d)  All determinations and decisions under the ATP, including but not limited to the number of employees, if any, to be bound to the ATP, the progress and successful completion of the ATP, shall be the exclusive right and responsibility of the Company.

## Section 2:  Safety and Health

(a)  Safety is the responsibility of each individual employee as well as the Union and the Company. The Union

79

agrees to cooperate with the Company to promote and maintain safety and health in the work environment.

(b) To that end, a Joint Safety Committee (JSC) is established, the purpose of which is to review safety practices, procedures and conditions and make recommendations for changes, improvements or modifications to the Director of Plant Operations, which actions, if any, shall be at his discretion.

(c) The JSC shall include four (4) members, two (2) each to be appointed by the Union and the Company. The Chair shall alternate each contract year between the Union and the Company Committee members with a Company Committee selectee serving the first term. The Committee shall meet upon call by the Chair which shall be no less often than once a calendar quarter. Committee members attending such meetings or investigating safety concerns of a general preventive nature at the written direction of the Chair, which investigation has been approved in writing by the Director of Plant Operations, or his designee, shall lose no pay for up to twenty (20) hours per contract year for such investigations, which hours may be increased by mutual agreement. Committee members shall obtain permission from the Director of Plant Operations, or his designee, before leaving work to conduct an investigation covered by this Section. The two (2) Union appointees shall not be changed more often than every six (6) months except for exceptional reasons (e.g., resignation, or termination of

80

employment).

## ARTICLE XIX - SICK LEAVE

### Section 1:  Accrual Rate

Sick leave may be accrued by regular full-time employees at the rate of one day per month and by regular part-time employees at the rate of one-half day per month.

### Section 2:  Reasons for Use

An employee may use sick leave for:

1.   Personal illness

2.   Outpatient treatment or examination by or under the prescription of a physician or dentist.

### Section 3:  Accumulation

There is no limit on the accumulation of sick leave. Payment of sick leave shall be made from the available hours in an employee's sick leave account. In the event an employee is eligible for other compensation due to disability, illness or an accident, sick leave may be used only to the extent it is necessary to assure regular straight-time pay during absence from work. There will be no pay for sick leave upon termination of employment, whereupon it ceases to exist; however, a portion of accumulated but unused sick leave may be utilized by eligible employees as provided in Section 4 below. Sick leave will not accrue during periods of leave of absence without pay.

81

## Section 4: Use of Accumulated Unused Sick Leave by Retirees/Spouses

Effective July 1, 1994, the Company will use accumulated but unused sick leave of individual retirees to purchase SECI Medical Insurance (MI) or a Medicare supplement when a retiree, or in the case of the retiree's death, the retiree's spouse, elects to continue to participate in MI or purchase a Medicare supplement through the Company. The accumulated but unused sick leave shall be used as follows:

(a) When an employee retires (at age 55 or later) and the retiree elects, or in the event of the retiree's death, the retiree's spouse elects, to continue to participate in the SECI MI or a Medicare supplement offered through SECI, SECI shall apply a portion of the retiree's accumulated but unused sick leave as a contribution by SECI for the payment of premiums for SECI MI or Medicare supplement. The contribution by SECI will be used for the payment of premiums as employer contributions for payment of premiums to provide medical insurance or Medicare supplement insurance for the retiree, retiree's spouse and retiree's dependants who are eligible to participate in the SECI MI or Medicare supplement. Under no circumstances will the retiree, the retiree's spouse, or dependants receive any of the accumulated

unused sick leave in cash from the Company. The use of the accumulated but unused sick leave shall be subject to the conditions set forth in subsections (b) through (h) below:

(b)  The amount of accumulated but unused sick leave (sick leave) used by SECI to offset the premiums due for SECI MI or Medicare supplement shall be based on the percentage of the hours in the retiree's sick leave account as of the date of retirement at the retiree's rate of pay as of the date of retirement as follows:

| RETIREMENT AT OR AFTER AGE | PERCENTAGE FACTOR |
|:---:|:---:|
| 55 | 45% |
| 56 | 48% |
| 57 | 51% |
| 58 | 54% |
| 59 | 57% |
| 60 | 60% |

(c)  The retiree, and in the event of the retiree's death the retiree's spouse, must elect to continue SECI MI and agree, in writing, to pay premiums for

83

SECI MI. Said agreement must be executed by the retiree or the retiree's spouse within 90 days of retirement or 90 days after the death of the retiree, whichever applies. Such written election must be delivered in hand or mailed to the Company's General Manager. The retiree or retiree's spouse shall be responsible to establish by proof satisfactory to the Company that a timely election was made.

(d) The retiree, or in the event of the retiree's death, the retiree's spouse must pay the same percentage of the premiums that bargaining unit employees pay for individual and/or dependant coverage. The Company shall pay the balance of the premium from the retiree's sick leave account until that account is liquidated or forfeited as provided herein and thereafter the retiree, or in the event of the retiree's death, the retiree's spouse, shall be responsible to pay all premiums for individual and/or dependant coverage.

(e) The balance of the retiree's sick leave account shall be forfeited upon the first of any of the following occurrences:

(1) Failure of the retiree or spouse to make a timely written election under subsection (c).

(2) Failure of the retiree or spouse, whichever is

84

applicable, to pay their contribution in a timely fashion.

(3)   The retiree, or in the event of the retiree's death the retiree's spouse, becomes covered by another medical insurance plan.

(4)   The death of the retiree in the event the spouse does not make a timely election under subsection (c).

(5)   The death of the retiree's spouse if the retiree's spouse has made a timely election under subsection (c).

(f)   In the event the retiree or in the event of the retiree's death the retiree's spouse has made a timely election under subsection (c) but later becomes ineligible to continue the SECI MI for any reason, including but not limited to any of those set forth in subsection (e) above, the forfeiture shall apply regardless of whether the occurrence which triggered the forfeiture may at a later date cease to exist.

(g)   In the event the Company ceases to provide and/or make available a MI and/or a Medicare Supplement or changes the plan or changes the premium rates for bargaining unit employees and/or their dependents, the same shall apply to

85

retiree's and retiree's spouse.

(h)  In the event an employee leaves employment for any reason, including but not limited to termination, voluntary quit, layoff, disability, death or otherwise, before retirement as provided in subsection (a) above, all sick leave in the employee's account shall be forfeited.

## Section 5: Verification

Employees shall submit medical certificates or other acceptable evidence of illness for sick leave whenever requested to do so by their immediate supervisor.

## Section 6:  Charging

When illness or injury occurs during annual leave, the employee may charge that portion of the leave to sick leave if he or she presents a physician's certificate or other acceptable evidence to his or her supervisor upon returning from leave.

# ARTICLE XX - DURATION

This Agreement shall terminate in all its terms June 30, 2003, at 11:59 p.m.

W. Malcolm Fabre                    Date
President
UWUA, Local 551

David G. Brunk, Jr.                 Date
Vice President
UWUA, Local 551

Jay C. Hardy                        Date
Secretary
UWUA, Local 551

John W. Overton                     Date
Treasurer
UWUA, Local 551

Grace D. Barfield                   Date
Executive Committee
UWUA, Local 551

Frederick J. Ricker                 Date
Director, Region II
UWUA

Richard J. Midulla                  Date
Exec. V. P. & General Manager
SECI

James R. Duren                      Date
Vice President - Technical Division
SECI

William B. Miller                   Date
Director of Human Resources
SECI

James G. Pittman                    Date
Director of Plant Operations
SECI

William P. Shipskie                 Date
Assistant Plant Manager
SECI

Walter J. Hentze                    Date
Plant Operations Manager
SECI

Walter R. Sharp                     Date
Personnel Administrator - Plant
SECI

87

# APPENDIX 1
## SHIFT DIFFERENTIAL/MEAL ALLOWANCE

Several questions have arisen from the recent agreement between Local 551 and SECI Management. The following clarification will be used for shift differential/meal allowance:

1) For purposes of clarifying the existing Meal Allowance Practice for regular shift employees, designation of meals which would be customarily eaten is as follows:

    A) 6:00 a.m.          -          Before-Shift Meal

    B) 6:00 p.m          -          After-Shift Meal

    C) 12:00 p.m. and a.m. -   Mid-Shift Meal

2) Employees required to work more than two (2) hours beyond their scheduled quitting time who have not been given notification prior to arriving on site for that day's shift will be eligible for a meal allowance; thereafter each six (6) hours of continuous work following the previous meal period, the employee will be eligible for a meal allowance in accordance with the meal practice. If adequate notification is given, the employee will be compensated with a shift differential for hours actually worked at the appropriate rates in the shift actually worked.

88

3) "After-Shift" for regular shift workers shall be the hours between regular quitting time and 12:01 a.m. The following criteria will be required in clarifying the existing Meal Allowance Practice for After-Shift Meal eligibility:

   A) Employees work more than two (2) hours past their scheduled quitting time or employees are called out and report back to work between quitting time and 12:01 a.m.

   B) Less than eight (8) hours notice given.

   C) Employee will be eligible for After-Shift Meal if they work through 6:00 p.m. and/or a Mid-Shift Meal if they work through 12:00 a.m.

4) "Before-Shift" for regular shift employees shall be between the hours of 12:01 a.m. and their regular scheduled starting time. The following criteria will be required in clarification to existing meal practice:

A) Employees report to work more than two (2) hours before the start of their regular shift.

B) Less than eight (8) hours notification given.

C) Employees will be eligible for a "Before-

89

Shift" Meal provided they work through 6:00 a.m. and/or a Mid-Shift Meal in accordance with the existing meal practice.

# APPENDIX 2
## LIGHT DUTY/OVERTIME

Individuals on Light Duty will be removed from the Overtime List for the duration of the light duty. In addition, the individual will be "averaged in" on the Overtime List when he/she is returned to full duty.

This applies to all light duty and will be controlled administratively even in the case of short duration light duty. It is recognized the intent of this action is to insure only individuals capable of full duty are given the opportunity to work overtime.

If, however, within each RC all full duty employees are working overtime the light duty employee will be eligible for specific overtime under the following conditions:

1.  Overtime is approved by the department superintendent after review.

2.  Light duty restrictions will not impact the performance of the overtime task and are not related to working a limited number of hours.

3.  All full duty employees within the same RC are working equal or greater amount of overtime.

4.  When a individual(s) within the RC can be released from O.T. it will be the "light duty" personnel who is(are) released first.

91

The intent of this action is to allow the use of the limited capabilities of those "light duty" personnel on tasks that can be accomplished safely by them without impacting the O.T. opportunities of the full duty employees.

# APPENDIX 3
## OPERATOR POSITION REQUIREMENTS

SECI's philosophy in operations has been to insure that a "topped-out" position requires that the employee be capable of being THC'd to the next level of responsibility. This is advantageous to both the employee and SECI.

While it is straightforward as a requirement when involved in the apprentice program there is some confusion at levels above the position at which the apprentice program had been completed. A training program to insure consistency with the philosophy begun in apprentice training is used to continue to make the employee more valuable to SECI - resulting in continued step raises.

It is important that employees understand that while completing the apprentice and/or training programs is a part of their job employees will not be forced to work a THC position. If employees complete the training requirements and decide not to "work up", that's an employees decision and it won't be held against employees. However, in an emergency, employees will be expected to perform the work as directed. The issue of THC compensation will not limit supervision's ability to direct the work necessary to be done.

It is in your best interest as well as SECI's that you complete the required training.

93

# APPENDIX 4
## THC TO NON-BARGAINING UNIT
## POSITIONS/OVERTIME

When a new or returning employee is added to a job classification, for overtime assignment purposes he shall be constructively assigned the overtime hours accumulated averaged by the high and low man in the job classification as to the day the employee is initially assigned or returns to the classification. The interpretation of this is as discussed:

An individual who is upgraded to a higher classification (THC'd, Sick Leave (Short Term Disability or Long Term Disability), or Light Duty) for a period of more than 7 days will be averaged back into the employee's classification by totalling the overtime hours worked by all employees within the employee's classification for the time period employee is effected and dividing that sum by the quantity of employees of his classification. The number of overtime hours will be added to the total overtime hours he had prior to be effected.

# APPENDIX 5
# ROTATING SHIFT WORKERS/
# 12 HOURS PER SHIFT

The intent of this agreement is to provide a mechanism whereby rotating shift workers in the coal handling group employed by Seminole Electric Cooperative, Inc. may work a 12-hour shift. Wages paid to employees and cost to the Cooperative should not change due to this agreement.

**Sick Leave** - It is assumed that the use of sick leave will be randomly distributed throughout the year. Sick leave will count as an hour worked except on the fourth day of a scheduled 48-hour work week. If a day of sick leave is taken on the fourth day of a scheduled 48-hour work week, 12 hours of straight time would be paid for that day. Example: If an employee misses the fourth day of a scheduled 48-hour work week, 48 hours of straight time would be paid for the week. Had the employee worked the fourth day of the 48-hour work week, 40 hours of straight time would be paid for the week plus 8 hours at the overtime rate. A day of sick leave taken on any other regularly scheduled workday will count as 12 hours of sick time used and will be paid at the applicable base wage rate. Sick leave used will count as an hour worked for purposes of computation of overtime except as previously explained on the fourth day of the 48-hour week.

**Annual Leave** - Any hour taken as annual leave during the regularly scheduled working hours will count as an hour

95

worked. A full day of vacation taken on the fourth workday of the 48-hour week will be paid as follows:  4 hours straight time plus 8 hours at the overtime rate. All hours of annual leave taken during the regular scheduled working hours will be charged to the employee's annual leave account.

**Example No. 1**  -  An employee takes the three days off on vacation during the 36-hour week. ·Thirty-six hours of annual leave are charged to the employee.

**Example No. 2**  -  An employee takes four days annual leave during the week scheduled to work 48 hours. Forty-eight hours of annual leave will be charged to the employee's account.

**Authorized Leave With or Without Pay**  -  (SECI Policy No. 503) Instead of allowing days as stated in the policy, equivalent hours will be allowed. For instance; Death-In-Family, 24 hours will be allowed as paid time off. Serious confining illness, 24 hours for each event with a maximum of 40 hours per year. Time taken on the fourth day of a 48-hour week will result in straight time being paid.

96

**Shift Premium** - The shift premium will be adjusted so that on an annual basis, the shift premium paid for 12-hour shift workers will equal that paid for 8-hour continuous shift workers. For workers on the 12-hour shift, only one shift premium rate will be used. This shift premium rate will be paid for the "night shift". The "night shift" will be denied as the shift in which the majority of hours fall between 6:00 p.m. and 6:00 a.m. The shift premium will be paid for all hours worked on the "night shift".

 Computation of Total Annual Shift Premium Paid for 8-hour Shift Workers:

56 hrs./cycle x 0.40 dollars/hr. x 13 cycles/yr. = $291.20/hr.

            (shift premium paid for midnight shift)

56 hrs./cycle x 0.55 dollars/hr. x 13 cycles/yr.            = $400.00/yr.

            (paid for evening shift)

Total for shift premium/yr.                     = $691.60/yr.


Total hours worked on the 12-hour shifts:

26 weeks x 36 hrs/wk.       = 936 hrs.

97

26 weeks x 48 hrs/wk.    = 1,248 hrs.

              Total    = 2,184 hrs./yr.

When working a 12-hour shift, exactly half of the scheduled hours will be worked on the night shift.

2,184 hrs. ÷ 2    = 1,092 hrs. worked on the night shift

$691.60 ÷ 1,092 = $0.63 dollars/hr.

Therefore, the shift premium for 12-hour shift workers will be $0.63 per hour for all hours worked on the night shift.

**Holidays**

> If a holiday falls on a scheduled day off, 36-hour week; the employee will receive 36 regular hours + 8 regular hours for holiday = 44 regular hours pay for week.

> If a holiday falls on S.W.D., 36-hour week; the employee will receive 12 hours regular + 12 hours regular + 8 hours regular (holiday) + 12 hours O.T. (holiday) = 32 hours regular + 12 hours O.T.

If a holiday falls on S.D.O., 48-hour week; the employee will receive 40 hours regular + 8 hours O.T. + 8 hours holiday = 48 hours regular + 8 hours O.T. pay.

If a holiday falls on S.W.D., but not fourth day of 48-hour week, employee will receive 8 regular hours holiday + 12 O.T. (holiday) + 24 hours regular + 4 hours regular + 8 hours O.T. = 36 hours regular + 20 hours O.T.

If a holiday falls on fourth day of 48-hour week, the employee will receive 36 regular hours - 8 regular (holiday) + 12 O.T. (holiday) = 44 regular hours + 12 O.T. hours.

**Floating Holidays** would be observed as scheduling permits during regular scheduled workdays. For purposes of computation of overtime during floating holidays, the same rules will apply as in Annual Leave.

It is the intent of this section to only pay overtime for holidays if the holiday falls on a scheduled workday, that day is actually worked and no alternate day off is requested and approved.

99

**Adjustment Factor to Achieve Wage/Cost Neutrality**

Assumptions:

When working 8-hour shift:

6 of 8 holidays fall on SWD

4 shift rotation exists with no relief shift resulting in scheduled overtime.

When working 12-hour shift:

4 of 8 holidays fall on SWD

1 day of S.L. will be used on 4th day

1 holiday will fall on 4th SWD ( on average )

No relief shift used, resulting in scheduled O.T.

**8 hours***:

    2,080 hrs. (including vacation and holiday on SWD)

      16 hrs. (holiday falling on SDO)

      72 hrs. (holiday O.T.; 6 holidays x 8 x 1.5 = 72)

      156 hrs. Scheduled O.T. (13 days x 8 hr./day x 1.5 = 156)

    2,324

**12 hours:**

    936 hrs.  = (12 hr./day x 3 day/wk. x 26 wk.);

regular time for 36-hour week

1,040 hrs. = ((12 hr./day x 3 day/wk.)+ 4 hr./day) x 26 weeks;
regular time for 48-hour week

312 hrs. = 8 hr./day x 26 weeks x 1.5;

scheduled O.T. for scheduled workdays

60 hrs. = ((3 holiday  x  12 hr./holiday) + 4 hr.)  x  1.5;

holiday O.T. for scheduled workdays

32 hrs. =  8 hr./holiday  x  4 holiday;

holidays that fall on scheduled days off

- 12 hrs.        -4 hr./holiday  x  3 holidays

- 4 hrs.        S.L. used on 4th day

2,364 hrs.

** for holidays that fall on scheduled work days, only 8 hours regular time is paid for holiday instead of 12 hours.

2,324/2,364 = 0.9831 = Reduction factor to be applied to all wage rates in appendices of contract when working a 12-hour shift.

**Adjustment to Overtime Hours Worked Outside the Established Schedule** - Overtime hours worked outside of the regular schedule will be compensated without the reduction factor calculated in Adjustment factor to achieve wage/cost neutrality.

101

# APPENDIX 6
## CLARIFICATION OF OVERTIME DURING LEAVE

When any leave is taken in conjunction with a weekend or holiday, the entire period should be considered as the employee being on leave, unless the employee and his/her supervisor mutually agree in advance that the employee will be available for overtime.

The employee should not be disturbed unless an emergency situation exists or an employee establishes a pattern of taking leave to avoid weekend overtime.

102

# APPENDIX 7

October 6, 1993

## LETTER OF AGREEMENT
## SENIORITY TIE-BREAKING RULE

Seminole Electric Cooperative, Incorporated (SECI) and the Utility Workers Union of America (UWUA), Local 551, agree to the following procedure for the determination of seniority.

The parties agree that in the event two or more employees have the same job seniority date, the following criteria will be used to determine seniority:

1)      Job Seniority Date

2)      Department Seniority Date

3)      Company Seniority Date

4)      Application Date

5)      By one toss of a coin

# APPENDIX A
## EFFECTIVE JULY 1, 1999

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| Unit Operator | 21.87 | 22.20 | 22.57 | 22.92 |
| Auxiliary Operator | 18.83 | 19.20 | 19.57 | 19.95 |
| Utility Operator | 13.21 | 14.03 | 14.39 | 14.73 |
| | 15.28 | 15.85 | 16.40 | 16.96 |
| | | | | |
| I & C Technician II * | 23.65 | | | |
| I & C Technician I | 20.67 | 21.00 | 21.34 | 21.70 |
| Utility I & C Technician | 13.21 | 14.03 | 14.36 | 14.73 |
| | 15.28 | 15.85 | 16.40 | 16.96 |
| | | | | |
| Master Electrician * | 23.37 | | | |
| Electrician | 20.67 | 21.00 | 21.34 | 21.70 |
| Utility Electrician | 13.21 | 14.03 | 14.39 | 14.73 |
| | 15.28 | 15.85 | 16.40 | 16.96 |
| | | | | |
| Master Mechanic * | 23.37 | | | |
| Mechanic | 20.67 | 21.00 | 21.34 | 21.70 |
| Utility Mechanic | 13.21 | 14.03 | 14.39 | 14.73 |
| | 15.28 | 15.85 | 16.40 | 16.96 |
| | | | | |
| Tool Room Attendant | 17.90 | 18.26 | 18.64 | 19.00 |
| | | | | |
| Equipment Operator | 20.31 | 20.70 | 21.06 | 21.43 |

104

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| Heavy Equipment Operator | 17.90 | 18.26 | 18.64 | 19.00 |
| Utility Equipment Operator | 13.21 | 14.03 | 14.39 | 14.73 |
| Senior Chemical Technician | 21.60 | 21.92 | 22.27 | 22.63 |
| Chemical Technician | 16.32 | 16.89 | 17.50 | 18.07 |
| Utility Chemical Technician | 13.21 | 14.03 | 14.39 | 14.73 |
| Storekeeper | 17.90 | 18.62 | 19.32 | 20.02 |
| Warehouseman II | 14.98 | 15.69 | 16.41 | 17.44 |
| Warehouseman I | 10.94 | 11.81 | 12.60 | 13.38 |
| Support System Operator | 18.83 | 19.20 | 19.57 | 19.95 |
| Utility Support System Operator | 13.21 | 14.03 | 14.39 | 14.73 |
|  | 15.28 | 15.85 | 16.40 | 16.96 |
| General Utility Helper | 10.94 | 11.59 | 11.96 | 12.33 |
| Substation Technician | 20.67 | 21.00 | 21.34 | 21.70 |
| Utility Substation Technician | 13.21 | 14.03 | 14.39 | 14.73 |
| Relay Technician II | 23.37 | 23.78 | 24.14 | 24.50 |
| Relay Technician I | 20.67 | 21.00 | 21.34 | 21.70 |
| Utility Relay Technician | 13.21 | 14.03 | 14.39 | 14.73 |

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| | 15.28 | 15.85 | 16.40 | 16.96 |
| **Transmission Equipment Operator** | 17.90 | 18.26 | 18.64 | 19.00 |
| **Plant Clerk** | 8.72 | 9.00 | 9.27 | 9.54 |
| | 9.81 | 10.09 | 10.36 | 10.63 |
| **Planning Assistant** | 9.27 | 9.54 | 9.81 | 10.09 |
| | 10.36 | 10.63 | 10.91 | 11.18 |
| **Purchasing Assistant** | 10.09 | 10.36 | 10.63 | 10.91 |
| | 11.18 | 11.45 | 11.73 | 11.99 |

106

# APPENDIX B
## EFFECTIVE JULY 1, 2000

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| Unit Operator | 22.57 | 22.91 | 23.29 | 23.65 |
| Auxiliary Operator | 19.43 | 19.81 | 20.20 | 20.59 |
| Utility Operator | 13.63 | 14.48 | 14.85 | 15.20 |
| | 15.77 | 16.36 | 16.92 | 17.50 |
| I & C Technician II * | 24.41 | | | |
| I & C Technician I | 21.33 | 21.67 | 22.02 | 22.39 |
| Utility I & C Technician | 13.63 | 14.48 | 14.85 | 15.20 |
| | 15.77 | 16.36 | 16.92 | 17.50 |
| Master Electrician * | 24.12 | | | |
| Electrician | 21.33 | 21.67 | 22.02 | 22.39 |
| Utility Electrician | 13.63 | 14.48 | 14.85 | 15.20 |
| | 15.77 | 16.36 | 16.92 | 17.50 |
| Master Mechanic * | 24.12 | | | |
| Mechanic | 21.33 | 21.67 | 22.02 | 22.39 |
| Utility Mechanic | 13.63 | 14.48 | 14.85 | 15.20 |
| | 15.77 | 16.36 | 16.92 | 17.50 |
| Tool Room Attendant | 18.47 | 18.84 | 19.24 | 19.61 |

107

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| **Equipment Operator** | 20.96 | 21.36 | 21.73 | 22.12 |
| **Heavy Equipment Operator** | 18.47 | 18.84 | 19.24 | 19.61 |
| **Utility Equipment Operator** | 13.63 | 14.48 | 14.85 | 15.20 |
| | 15.77 | 16.36 | 16.92 | 17.50 |
| **Senior Chemical Technician** | 22.29 | 22.62 | 22.98 | 23.35 |
| **Chemical Technician** | 16.84 | 17.43 | 18.06 | 18.65 |
| **Utility Chemical Technician** | 13.63 | 14.48 | 14.85 | 15.20 |
| **Storekeeper** | 18.47 | 19.22 | 19.94 | 20.66 |
| **Warehouseman II** | 15.46 | 16.19 | 16.94 | 18.00 |
| **Warehouseman I** | 11.29 | 12.19 | 13.00 | 13.81 |
| **Support System Operator** | 19.43 | 19.81 | 20.20 | 20.59 |
| **Utility Support System Operator** | 13.63 | 14.48 | 14.85 | 15.20 |
| | 15.77 | 16.36 | 16.92 | 17.50 |
| **General Utility Helper** | 11.29 | 11.96 | 12.34 | 12.72 |
| **Substation Technician** | 21.33 | 21.67 | 22.02 | 22.39 |
| **Utility Substation Technician** | 13.63 | 14.48 | 14.85 | 15.20 |
| | 15.77 | 16.36 | 16.92 | 17.50 |

108

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| **Relay Technician II** | 24.12 | 24.54 | 24.91 | 25.28 |
| **Relay Technician I** | 21.33 | 21.67 | 22.02 | 22.39 |
| **Utility Relay Technician** | 13.63 | 14.48 | 14.85 | 15.20 |
| | 15.77 | 16.36 | 16.92 | 17.50 |
| **Transmission Equipment Operator** | 18.47 | 18.84 | 19.24 | 19.61 |
| **Plant Clerk** | 9.00 | 9.29 | 9.57 | 9.85 |
| | 10.12 | 10.41 | 10.69 | 10.97 |
| **Planning Assistant** | 10.69 | 10.97 | 11.26 | 11.54 |
| **Purchasing Assistant** | 10.41 | 10.69 | 10.97 | 11.26 |

109

# APPENDIX C
# EFFECTIVE JULY 1, 2001

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| Unit Operator | 23.27 | 23.62 | 24.01 | 24.38 |
| Auxiliary Operator | 20.03 | 20.42 | 20.83 | 21.23 |
| Utility Operator | 14.05 | 14.93 | 15.31 | 15.67 |
| | 16.26 | 16.87 | 17.44 | 18.04 |
| I & C Technician II * | 25.17 | | | |
| I & C Technician I | 21.99 | 22.34 | 22.70 | 23.08 |
| Utility I & C Technician | 14.05 | 14.93 | 15.31 | 15.67 |
| | 16.26 | 16.87 | 17.44 | 18.04 |
| Master Electrician * | 24.87 | | | |
| Electrician | 21.99 | 22.34 | 22.70 | 23.08 |
| Utility Electrician | 14.05 | 14.93 | 15.31 | 15.67 |
| | 16.26 | 16.87 | 17.44 | 18.04 |
| Master Mechanic * | 24.87 | | | |
| Mechanic | 21.99 | 22.34 | 22.70 | 23.08 |
| Utility Mechanic | 14.05 | 14.93 | 15.31 | 15.67 |
| | 16.26 | 16.87 | 17.44 | 18.04 |
| Tool Room Attendant | 19.04 | 19.42 | 19.84 | 20.22 |

110

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| Equipment Operator | 21.61 | 22.02 | 22.40 | 22.81 |
| Heavy Equipment Operator | 19.04 | 19.42 | 19.84 | 20.22 |
| Utility Equipment Operator | 14.05 | 14.93 | 15.31 | 15.67 |
|  | 16.26 | 16.87 | 17.44 | 18.04 |
| Senior Chemical Technician | 22.98 | 23.32 | 23.69 | 24.07 |
| Chemical Technician | 17.36 | 17.97 | 18.62 | 19.23 |
| Utility Chemical Technician | 14.05 | 14.93 | 15.31 | 15.67 |
| Storekeeper | 19.04 | 19.82 | 20.56 | 21.30 |
| Warehouseman II | 15.94 | 16.69 | 17.47 | 18.56 |
| Warehouseman I | 11.64 | 12.57 | 13.40 | 14.24 |
| Support System Operator | 20.03 | 20.42 | 20.83 | 21.23 |
| Utility Support System Operator | 14.05 | 14.93 | 15.31 | 15.67 |
|  | 16.26 | 16.87 | 17.44 | 18.04 |
| General Utility Helper | 11.64 | 12.33 | 12.72 | 13.11 |
| Substation Technician | 21.99 | 22.34 | 22.70 | 23.08 |
| Utility Substation Technician | 14.05 | 14.93 | 15.31 | 15.67 |
|  | 16.26 | 16.87 | 17.44 | 18.04 |
| Relay Technician II | 24.87 | 25.30 | 25.68 | 26.06 |
| Relay Technician I | 21.99 | 22.34 | 22.70 | 23.08 |

111

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| **Utility Relay Technician** | 14.05 | 14.93 | 15.31 | 15.67 |
| | 16.26 | 16.87 | 17.44 | 18.04 |
| **Transmission Equipment Operator** | 19.04 | 19.42 | 19.84 | 20.22 |
| **Plant Clerk** | 9.28 | 9.58 | 9.87 | 10.16 |
| | 10.43 | 10.73 | 11.02 | 11.31 |
| **Planning Assistant** | 9.87 | 10.16 | 10.43 | 10.73 |
| | 11.02 | 11.31 | 11.61 | 11.90 |
| **Purchasing Assistant** | 10.73 | 11.02 | 11.31 | 11.61 |
| | 11.90 | 12.19 | 12.49 | 12.75 |

112

# APPENDIX D
# EFFECTIVE JULY 1, 2002

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| Unit Operator | 23.97 | 24.33 | 24.73 | 25.11 |
| Auxiliary Operator | 20.63 | 21.03 | 21.45 | 21.87 |
| Utility Operator | 14.47 | 15.38 | 15.77 | 16.14 |
| | 16.75 | 17.38 | 17.96 | 18.58 |
| I & C Technician II * | 25.93 | | | |
| I & C Technician I | 22.65 | 23.01 | 23.38 | 23.77 |
| Utility I & C Technician | 14.47 | 15.38 | 15.77 | 16.14 |
| | 16.75 | 17.38 | 17.96 | 18.58 |
| Master Electrician * | 25.62 | | | |
| Electrician | 22.65 | 23.01 | 23.38 | 23.77 |
| Utility Electrician | 14.47 | 15.38 | 15.77 | 16.14 |
| | 16.75 | 17.38 | 17.96 | 18.58 |
| Master Mechanic * | 25.62 | | | |
| Mechanic | 22.65 | 23.01 | 23.38 | 23.77 |
| Utility Mechanic | 14.47 | 15.38 | 15.77 | 16.14 |
| | 16.75 | 17.38 | 17.96 | 18.58 |
| Tool Room Attendant | 19.61 | 20.00 | 20.44 | 20.83 |
| Equipment Operator | 22.26 | 22.68 | 23.07 | 23.49 |

113

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| Heavy Equipment Operator | 19.61 | 20.00 | 20.44 | 20.83 |
| Utility Equipment Operator | 14.47 | 15.38 | 15.77 | 16.14 |
| | 16.75 | 17.38 | 17.96 | 18.58 |
| Senior Chemical Technician | 23.67 | 24.02 | 24.40 | 24.79 |
| Chemical Technician | 17.88 | 18.51 | 19.18 | 19.81 |
| Utility Chemical Technician | 14.47 | 15.38 | 15.77 | 16.14 |
| Storekeeper | 19.61 | 20.41 | 21.18 | 21.94 |
| Warehouseman II | 16.42 | 17.19 | 17.99 | 19.12 |
| Warehouseman I | 11.99 | 12.95 | 13.80 | 14.67 |
| Support System Operator | 20.63 | 21.03 | 21.45 | 21.87 |
| Utility Support System Operator | 14.47 | 15.38 | 15.77 | 16.14 |
| | 16.75 | 17.38 | 17.96 | 18.58 |
| General Utility Helper | 11.99 | 12.70 | 13.10 | 13.50 |
| Substation Technician | 22.65 | 23.01 | 23.38 | 23.77 |
| Utility Substation Technician | 14.47 | 15.38 | 15.77 | 16.14 |
| | 16.75 | 17.38 | 17.96 | 18.58 |
| Relay Technician II | 25.62 | 26.06 | 26.45 | 26.84 |
| Relay Technician I | 22.65 | 23.01 | 23.38 | 23.77 |

114

| JOB CLASSIFICATION | RATES/STEPS | | | |
|---|---|---|---|---|
| **Utility Relay Technician** | 14.47 | 15.38 | 15.77 | 16.14 |
| | 16.75 | 17.38 | 17.96 | 18.58 |
| **Transmission Equipment Operator** | 19.61 | 20.00 | 20.44 | 20.83 |
| **Plant Clerk** | 9.56 | 9.87 | 10.17 | 10.46 |
| | 10.74 | 11.05 | 11.35 | 11.65 |
| **Planning Assistant** | 10.17 | 10.46 | 10.74 | 11.05 |
| | 11.35 | 11.65 | 11.96 | 12.26 |
| **Purchasing Assistant** | 11.05 | 11.35 | 11.65 | 11.96 |
| | 12.26 | 12.56 | 12.86 | 13.13 |

115

2

# LABOR ARBITRATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In the Matter of an Arbitration

-between-

SEMINOLE ELECTRIC COOPERATIVE, INC.

- and -

UTILITY WORKERS UNION OF AMERICA
LOCAL 551

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Felton Discharge

## ARBITRATOR'S OPINION AND AWARD

Mark E. Levitt, Esq.
For the Company

Richard P. Siwica, Esq.
For the Union

**Roger I. Abrams**
**Arbitrator**

**April 28, 2003**

## I.    INTRODUCTION

By letter dated March 17, 2002, Seminole Electric Cooperative terminated Mark Felton for failing to report for work for 12 calendar days after being released to return to work by his physician. Felton grieved his discharge, and his Union, the Utility Workers of America, Local 551, processed the grievance. Unable to obtain relief through the grievance procedure, the Union invoked arbitration.

The hearing was held in Palatka, Florida, on February 13, 2003. Both parties presented oral testimony and relevant documents. Both parties filed briefs that were received by the Arbitrator by April 12, 2003.

## II.    The Issues

At the hearing the parties stipulated to the following statement of the issues to be resolved:

Was the Grievant discharged with just cause in accordance with the provisions of the Collective Bargaining Agreement?  If not, what shall be the remedy?

## III.    Background Facts

Seminole Electric Cooperative is a nonprofit provider of electric power to rural communities in 45 counties throughout Florida. It hired Mr. Mark Felton on July 25, 1988. After completing a three-year apprenticeship

training program, Felton became a utility mechanic. He was "working heights," as he described it, when the Company terminated him by letter dated May 17, 2002. He had received no prior discipline during his thirteen years with the Company.

In January 2002, Felton sought medical attention for a troubling condition that made him tired and sleepy all the time. Dr. Hussein Zabad saw Felton in his Palatka office on January 16 for an evaluation. Felton requested a short-term medical leave of absence from the Company.

By letter from the then Human Resources Manager Tip English dated January 25, the Company granted Felton the leave effective January 22, 2002, under the provisions of the Family & Medical Leave Act that requires an employer to grant a qualifying employee up to 12 weeks of unpaid leave in a rolling 12-month period. Felton had to first use up his remaining paid sick leave. The letter further stated: "You will be required to present a fitness-for-duty certificate prior to being restored to employment.   If this certification is not received, your return to work may be delayed until the certification is provided."

Dr. Zabad arranged two sleep studies for Felton. He examined Felton on a follow-up visit on February 7, 2002, and diagnosed the Grievant as having obstructive sleep apnea[1]. While off work, Felton received one short-

---

[1] "Sleep apnea afflicts more than 12 million people in the United States. . . People with sleep apnea stop breathing repeatedly during their sleep, often for a minute or longer, and as many as hundreds of times during a single

term disability check for $400 from the Company's carrier.[2] Felton saw Dr. Zabad again on March 7 and April 3, 2002. Dr. Zabad treated Felton with the most common therapy, using continuous positive air pressure (CPAP).

On March 28, 2002, Norman Van Dame, a Human Resources Specialist with the Company, wrote Felton a letter attaching the Company's Policy 517 on Sick and Disability Benefits. That Policy states that "Seminole will hold a position vacant for 90 days." The Company's letter to Felton read further:

> This letter is to inform you that under the provisions of this policy your present position of Mechanic will become eligible for posting effective April 22, 2002.  If after April 22, 2002 you are able to return to work you will be eligible to apply for any position that Seminole may have that fit your qualifications.

Felton understood from this letter that he was required to return to work by April 22 in order to retain his job.

By April 2002, Felton had run out of money. He also knew he had to return to work to keep his job, however poorly he was feeling. (A friend from work called to tell him he "better get in.") Felton testified that when he saw Dr. Zabad on April 3 he "begged him" to release him to return to work. Dr. Zabad did not want to release the Grievant, because his condition had not

---

night. . . [O]bstructive sleep apnea . . . occurs in approximately 2% of women and 4% of men over the age of 35." <http://www.sleepdisorderchannel.net/osa>

[2] While Felton was off work addressing his sleep condition, he also decided to seek medical attention for back problems he was experiencing. Apparently, he had applied for the short-term disability benefits for the back condition.

sufficiently improved. Reluctantly, Dr. Zabad wrote Felton a return-to-work certificate, but he also referred him to a neurologist, Dr. Quick, for an evaluation as to whether Felton was also suffering from narcolepsy. Dr. Zabad also scheduled various tests and a follow-up visit for May 3. Felton picked up the return-to-work slip from Zabad's office on April 5. It allowed him to return to work as of April 6, 2002.

Felton testified that on Monday, April 8, when he had planned to return to work, "I still didn't feel good, so I didn't show up at work." Dr. Zabad had made an appointment for Felton to see Dr. Quick on April 17, and Felton wanted to wait until Dr. Quick could see him. Dr. Quick set up an MRI of his brain. He later concluded that Felton did not have narcolepsy.

Felton called his maintenance supervisor, Carl Krueger, on April 15, to tell him he would be returning to work on April 18. (Krueger and Felton had worked together as fellow employees before the Company made Krueger a supervisor shortly before these events.) Krueger and Felton had talked about Felton's attendance in a coaching session on January 8, 2002. At that time, Felton told Krueger he needed to take some time off. Krueger referred him to Human Relations. Felton told Krueger later in January that he was going to be off on leave, but never explained the details of his medical condition. While Felton was off on leave, he talked with Krueger several times by phone, mostly to arrange for a fellow employee to bring home his check.

When he returned to work on April 18, Felton gave Krueger Dr. Zabad's certificate that gave him a full release to return to work as of April 6. According to Krueger's notes of their conversation, Felton told him "he thought he had until the 22nd before he had to be back at work." Krueger showed Felton's slip to the Manager of Plant Maintenance, Ken Hart, noting the "12-day void" that was not covered. Hart advised Krueger "to check out with Felton to see if the date was wrong."

Krueger's notes state that he told Felton to "get something from the doctor's office to fill up the twelve days." Felton called Dr. Zabad's office and "tried to get them to fax a new return to work slip and they said they would not." Zabad's nurse told Felton that he would have to see the doctor in order to get a slip. On April 18, Dr. Quick did write Felton a note that stated he was seen in his office on April 17 for an initial consultation. (Dr. Quick refused to give Felton any slip covering the twelve-day period in question because it was before he had even seen Felton.) Dr. Quick also told Felton: "Don't go back to work until I diagnose you."

Felton called Krueger on April 22 to tell him he had further medical appointments on April 23 and 25. (These appointments were follow-ups ordered by Dr. Quick.) Krueger reminded him once again that he would need a doctor's slip to cover the twelve-day period.

On April 24, 2002, Krueger called Felton to have him come to the plant the next day for an investigatory meeting. (At the arbitration hearing,

6

Felton agreed that Krueger's notes of that meeting were accurate.) Felton explained at the meeting that Dr. Zabad still had some tests to do, but he had "begged the doctor for the return to work." Felton did not yet have the "paperwork" the Company needed. Krueger's notes state that when asked why he did not return to work after he had been released, Felton responded that:

> He did not feel well and felt he would not be safe to himself and others.  He felt that going to other doctors that he was still under a care of a doctor. Mark said he still feels that he is not well and is not capable to function at this time. If you (the Company) want him to come to work, he will, but he is and still feels unsafe.

Union President David Brunk then stated that Felton had received "a letter from Tip English stating his STD [short-term disability] was ending on 4-22-02." Krueger suspended Felton "until further investigation." Krueger testified that despite asking Felton at least five times for documentation, he never received any documentation covering the 12-day period.

On April 26, 2002, Krueger wrote a memo to Ken Hart recommending that the Company discharge Felton because "we are still left with a 12 day period of unexcused absence. Due to the severity [number of days in question and failure to contact supervision] of this offense . . . I have no alternative. . . ."

Ken Hart testified at the arbitration hearing that he reviewed Felton's file for mitigating or aggravating circumstances and found none of either.  He also reviewed the Family and Medical Leave Act (FMLA). On April 29, 2002,

Hart wrote a memo to his superior, Paul Shipskie, recommending termination based on Felton's unapproved absence from work. In his testimony, Hart emphasized that under Policy No. 517, an employee "may be terminated" if he does not return to work when he has received a doctor's release. He explained that Felton's FMLA leave had expired. (He had already taken an FMLA leave during the rolling twelve-month period, and so he did not have the full twelve-week period remaining.) Hart emphasized that under its various policies management retains "leeway" regarding what penalty to impose.

In his testimony, Hart also explained that starting two years ago, the Company had discussions with the Union about changing plant rules and the "culture." New plant management decided "to turn around attitudes and the culture." Meeting with employees in small groups, Hart explained management's goals and invited employee participation. The Company was "raising the bar," according to Hart, and it "would not ignore sub-par performance." Felton was the first person terminated under this "new attitude." Hart said it was "hard to preach productivity and allow this to go on."

On cross-examination, Hart stated that in making his determination he did consider the fact that Felton had received no discipline in his thirteen years of employment: "I gave that a good deal of weight, but I did not deem this mitigating or enough to overrule" the policy violations. In his letter

recommending termination, Hart wrote that Felton was "not a stellar performer" when it came to attendance, but he acknowledged at the hearing that Felton had never received any discipline for attendance reasons. He never asked Felton why he thought he had until April 22, 2002, to report to work.

The Company decided it would terminate Felton. Richard A. Mills, the new Human Resources Administrator, prepared a termination letter on May 8 or 9. On May 10, 2002, before Felton's termination was issued, the Company received a faxed letter from Dr. Zabad that stated that he had taken Felton out of work in January:

> so that he could undergo further evaluation. The evaluation revealed that the patient was suffering from obstructive sleep apnea, which resolved with the use of a CPAP machine. He also suffered from depression that improved with the use of Effexer.
>
> At this time, I feel the patient is able to return to full-duty work on Monday, May 13, 2002, with no restrictions. If any further information is needed, please feel free to contact my office.

Despite receipt of this doctor's note, the Company decided to proceed with the termination. Mills revised the termination letter, now dated May 17, 2002, a week after the Company received the faxed note from Dr. Zabad. The revised termination letter contained one "oversight," according to Mills. The letter stated "As of May 7, 2002 you have provided no document which would excuse your absence from work during the period in question." Mills testified he had erred in not changing this date.

When Union President David Brunk gave Rick Mills Dr. Zabad's May 10 letter, he urged Mills to call the doctor if he had any further questions. Mills testified that he called the doctor's office on Friday May 10 and again on May 14 or 15, but he never spoke with Dr. Zabad. He did not try to schedule a time for a phone call with Dr. Zabad. Upon receipt of his termination letter, Felton filed this grievance.

On cross-examination, Felton admitted that he knew that an employee was suppose to return to work when his physician releases him. On April 6, although Dr. Zabad had released him to return to work, Felton said he was not feeling better and he was "not feeling safe." On April 18 he still didn't feel well, but he knew that he "had to go to work."

## IV.   RELEVANT PROVISIONS OF THE AGREEMENT

### Article III - GRIEVANCE AND ARBITRATION

**Section 4: Selection of the Arbitrator**

A.   Upon filing of a request for arbitration, the party requesting arbitration shall notify the arbitrator next in line under paragraph B and make arrangements with the arbitrator and the other party for an arbitration proceeding at a mutually acceptable date, time and place.

B.   The panel of arbitrators shall be Roger Abrams, Arvid Anderson, George Bennett, and William Lambert. Arbitrators shall be rotated in the order set forth above.

C.   The arbitrator's fees and expenses will be paid by the losing party. If the grievance is sustained, the Company shall be

deemed the loser.  If the grievance is denied, the Union shall be deemed the loser.  If the grievance is sustained in part and denied in part, the expenses of the arbitrator shall be borne equally among the parties.

### ARTICLE VI - DISCIPLINE

Section 4: Discharge

(a)     Employees who have successfully completed their probationary period may be disciplined up to and including discharge for any of the following reasons or for any other just cause: . . .

(11)     Improper absence from duty without authority. . .

Section 5: Arbitration

When any employee has been disciplined for one or more of the specifically enumerated reasons set forth in Section 4 above, and said employee is subjected to Article III, the Arbitrator shall deny the grievance if he is satisfied by a preponderance of the evidence that the employee violated one or more o[f] the specifically enumerated reasons for discipline in Section 4.

V.     CONTENTIONS OF THE PARTIES

A. The Company's Argument

The evidence shows that the Grievant was terminated consistent with the requirements of the Agreement. He was absent from work without

authorization from April 6 through April 18, 2002. The Company's plant practices and rules provide for the termination of an employee who has an unauthorized absence from work and who does not return to work after receiving a medical release. The Arbitrator has no power to modify the Company's express right to promulgate policies, procedures, rules and plant practices.

Article VI, Section 5 provides that the Arbitrator is required to uphold the termination of an employee who has violated one of the specifically enumerated reasons for discipline. Here a preponderance of the evidence shows that Felton's actions were an "improper absence from duty without authority," one of the enumerated reasons. The other plant rules also clearly support the Company's action. Of course, as arbitrator Whitley P. McCoy ruled, "Where an employee has violated a rule or engaged in conduct meriting disciplinary action, it is primarily the function of management to decide upon the proper penalty." Stockham Pipe Fittings Co., 1 LA 160, 162 (1945).

The record shows that the Company carefully considered this matter before deciding to terminate the Grievant.  There was no evidence of disparate treatment. The Grievant admitted that he understood he was to return to work when released by his doctor. In fact, he returned to work when he now says he was not safe! His belated note from his doctor, received after his termination letter was actually placed in the outgoing

mailbox, was insufficient to rebut the Grievant's clear violation of the Company's policies. Therefore, the grievance must be denied.

### B. The Union's Arguments

Felton's discharge was obviously unjust. The Company has not proven that he engaged in unauthorized absenteeism. The Grievant did exactly what he was asked to do by the Company, obtain a letter from his treating physician that covered his absence from work during the period in question. Moreover, by letter the Company told the Grievant he had to return to work by April 22, 2002, and he did. The Company then wrongfully terminated an employee with a perfect work record dating back to July 1988 when he was first employed.

It is apparent that the Company did not have just cause to terminate Mark Felton. He was not placed on notice of the consequences of his conduct. The Company's investigation failed to afford him due process. The Company did not follow the required steps of progressive discipline. Termination was grossly excessive. The Company should be ordered to reinstate the Grievant and make him whole, including an award of interest.

### VI.   DISCUSSION AND OPINION

Mark Felton worked as a mechanic at Seminole Electric for thirteen years. He had never received any discipline. The Company terminated him

13

on May 17, 2002, for not reporting for work for twelve days after his physician had released him to return to work. The parties have asked their Arbitrator to determine whether his termination violated their Agreement.

No employee, however long he works for a company, is immune from discipline or termination. A long blemish-free work record, however, does demonstrate that the employee has been capable of meeting the requirements of his job. It is a factor that cannot be ignored in assessing management's decision to separate a worker from employment. Here the Company says it considered Felton's long service, but it did not find it mitigating in these circumstances.

Felton took a medical leave of absence commencing January 22, 2002. He was suffering from a condition later diagnosed as obstructive sleep apnea. The Company sent him two letters that seemed to indicate he needed to return to work by April 22, 2002, or his position would be posted for bid. It is true, as the Company argues, that the letters were not unconditional promises to keep his job open until that date.

At best, however, the Company's letters were confusing. An ordinary, reasonable employee would have difficulty reading those letters as requiring an earlier return date. In any case, the Company did not terminate Felton for missing his report date. It discharged him because when he did report on April 18, his doctor's release stated he could return to work as of April 6,

and he had no documentation to account for the missing twelve calendar days.[3]

By early April 2002, Felton had run out of money. He needed to get back to work even if he was not better -- and he was not. At his monthly appointment with Dr. Zabad, Felton pressed his physician to release him to return to work.  The doctor was reluctant to do so, especially because he was in the process of ordering additional tests and having Felton seen by a neurologist, Dr. Quick.  However, Dr. Zabad finally agreed to his patient's request and wrote a note releasing him for work on April 6.

When April 8 arrived -- the first Monday after he was released to return to work -- Felton did not feel well. He did not report for work. When he later heard from a friend at work that his job was in jeopardy, he called his supervisor and arranged to come in to work on April 18. By then, Felton testified, he felt somewhat better. In any case, he thought he had to report before April 22 to keep his job.

When Company officials saw Dr. Zabad's note on April 18, they told Felton to procure a doctor's excuse for the April 6-18 "void" period.  They imposed no time limit on when Felton had to produce this note.  Dr. Zabad wrote such a note a few weeks later on May 10, the earliest Felton could obtain it. It was given to Company officials before they terminated Felton. The Company decided to terminate Felton anyway.

---

[3] As the Union points out, only eight workdays were involved.

The Company argues that under the Agreement it has the discretion to discharge Felton. Article VI, Section 4, does state that the Company may discipline "up to and including discharge" for the enumerated reasons, including "improper absence from duty without authority." The arbitrator in Section 5 is told to deny the grievance if satisfied "by a preponderance of the evidence" that the employee violated one or more of "the specifically enumerated reasons."

The Agreement contains no explanation as to what constitutes an "improper absence from duty without authority," the enumerated reason relied upon by the Company here. Would _any_ unexcused absence of any length constitute an "improper absence without authority" and thus justify discharge? That cannot possibly be what the parties intended in their Agreement.

The introductory sentence in Article VI, Section 4 helps explain what the parties meant. It states that the Company has the right to terminate for the listed reasons or "for any other just cause." (emphasis added) This wording suggests that the listed reasons must be read in light of the "just cause" standard.[4]

To further flesh out the meaning of the list of dischargeable offenses and to encourage employee compliance, the Company has used its

---

[4] There is, of course, the clear statement in Section 5 that the Company need only prove its case by a preponderance of the evidence, a departure

significant reserved power to manage the plant by promulgating various written policies and practices. As Ken Hart set forth in detail in the Company's second step response to Felton's grievance, under Plant Practice 5001.56 the recommended progressive discipline penalties are not mandatory. The Company, he said in his testimony, could discharge Felton if it so desired without using progressive discipline. The Union responds that progressive discipline is certainly the norm under this Practice document. The Company has not explained why this employee's error warranted ignoring progressive discipline, especially in light of the Grievant's long, unblemished record of service to the Company.

Hart referred to document PL-4 addressing the reporting of absences. It states that "unauthorized absence from work . . . [is] grounds for disciplinary action of an employee." The Union notes that this policy does not say that it constitutes grounds for summary termination. Rather, it argues once again that the Company must employ progressive discipline for an unexcused absence.

Hart also noted that Policy No. 514 on termination says in Section II, Paragraph B.2.e. that an employee may be terminated for "unjustified absence without leave." But Felton was on leave during the period in question.   The only issue raised by the Company was whether he could document that he was still under a doctor's care until he reported for duty.

_____

from the quantum of proof many arbitrators apply in discharge cases. The

Finally, Hart focused on Policy No. 517 addressing sick and disability benefits, Section II, D - REINSTATEMENT, that states:

> An employee will be expected to return to work after a disability upon receipt of a medical release from the attending physician stating that the employee may perform normal duties. If the employee chooses not to return upon medical release, his or her position may be filled and employment terminated.

Hart also explained that Felton's Family and Medical Leave Act coverage had expired.

There is a natural tendency in a case like this for two fine lawyer advocates to argue a technical reading of this pile of documents. The language of policies can become a trap, however, either for an employee or an employer because reasonable interpretations may point in different directions. Thankfully, we can reach certain clear understandings.

- The parties intended that employees released for work by their attending physicians would return to work forthwith. Felton did not do that.
- Felton knew he had to present documentation upon return to work. That is why he begged Dr. Zabad to give him an early release. However, he was not physically well enough to report that early.
- When Felton finally came to work on April 18, the Company was not ready to discard its long-term employee even though he showed up with a note that had released him twelve days earlier.

---

Agreement controls, as always.

Krueger told him to get a doctor's note to document that his absence from work from April 6 through April 18 was for medical reasons. The record shows that that <u>this is exactly what Felton did.</u>

Of course, Dr. Quick refused to write Felton a note covering a period of time before he treated Felton. (It would have violated medical ethics to do so.) Dr. Zabad's nurse told Felton he would have to come in and see the doctor to obtain another note. He did so on May 3. Felton persisted in his efforts both to get well and to meet the Company's legitimate requests. He had told the Company at the investigative meeting on April 25 that he was still not well and that he did not feel safe enough to work.

When the Company received Dr. Zabad's letter on May 10, it had all the information it had requested. At that point in time there was no "improper absence from duty without authority," even assuming for purposes of discussion that this contract phrase referred to this type of situation.[5] At that point, there was no basis under the Agreement to terminate Felton.

The Company relies on two arbitration decisions that should be addressed. In <u>Bridgford Frozen-Rite Foods</u>, 91 LA 681 (1988), Arbitrator McKee upheld the discharge of a 30-year employee for theft of a $5 box of

---

[5] If the Company had problems with Dr. Zabad's letter or if it felt it needed additional information, it could have raised them with the physician.

hairnets. The collective bargaining agreement specifically provided for discharge. Arbitrator McKee was correct. Theft is a fundamental breach of the employment bargain, as this Arbitrator has held on numerous occasions, and the minimal value of the stolen property should not mitigate the discharge.

Mark Felton did not steal anything, nor did he punch his supervisor or sabotage the workplace, nor do anything else that would warrant summary termination. He did fail to report for work immediately upon being released by his doctor. But can the Company decide that this too was a material breach and terminate him without use of some form of progressive discipline?

Here, the Company cites the old chestnut from arbitrator Whitley P. McCoy in <u>Stockham Pipe Fittings Co.,</u> 1 LA 160, 162 (1945). The McCoy precedent is a staple of management briefs in labor arbitration, especially the line where he states that an arbitrator should not substitute his judgment for that of management.[6]

---

Admittedly, it tried, but then it gave up without any explanation. The Company does not explain why the Zabad letter was insufficient.

[6] The complete quote from McCoy's opinion is as follows:

> Where an employee has violated a rule or engaged in conduct meriting disciplinary action, it is primarily the function of management to decide upon the proper penalty. If management acts in good faith upon a fair investigation and fixes a penalty not inconsistent with that imposed in other like cases, an arbitrator should not disturb it. The mere fact that management has imposed a somewhat different penalty or a somewhat more severe penalty than the arbitrator would have, if he had had the

McCoy's opinion, however, is not black and white, but rather shades of gray. For example, he writes: "The mere fact that management has imposed *a somewhat* different penalty or *a somewhat* more severe penalty than the arbitrator would have, if he had had the decision to make originally, is no justification for changing it." (emphasis added) This would mean, for example, that McCoy would not reduce a five-day suspension to a four-day suspension just because the arbitrator would have chosen four days to begin with.   He is correct: "The minds of equally reasonable men differ," says McCoy.

It becomes problematical when McCoy's dictum is applied in other situations. Consider a case where, under the "just cause" standard, an employee's first-time misconduct might warrant a written warning. Should an employer's six-week or two-month disciplinary suspension stand? These are not "somewhat different penalties," but penalties of a different order

---

decision to make originally, is no justification for changing it. The minds of equally reasonable men differ.   A consideration which would weigh heavily with one man will seem of less importance to another: A circumstance which highly aggravates an offense in one man's eyes may be only slight aggravation to another. If an arbitrator could substitute his judgment and discretion for the judgment and discretion honestly exercised by management, then the functions of management would have been abdicated, and unions would take every case to arbitration.   The result would be as intolerable to employees as to management.   The only circumstances under which a penalty imposed by management can be rightfully set aside by an arbitrator are those where discrimination, unfairness, or capricious and arbitrary action are proved -- in other words, where there has been abuse of discretion.

under the "just cause" standard.  "Reasonable minds" cannot differ on this. To much the same effect, employee behavior that would warrant at most a modest disciplinary suspension would not justify the termination of his employment.[7]

McCoy expresses his concern: "If a ~~bitrator could substitute his judgment and discretion for the judgment by management, then the functions of abdicated, and union would take every ignores the fact that a collective bargai "just cause" provision. (That was not th his opinion.) Management does not negotiates, and, in the process, it ag review by a neutral arbitrator un management proves it had "just caus

---

[7] My colleague Professor Dennis Nolan and I have suggested a principled approach to understanding "just cause" in "Toward a Theory of Just Cause in Employee Discipline Cases," 1985 Duke L. J. 594. Termination is warranted for certain intolerable actions or when the employee has proven that he is incapable of meeting the essential elements of his job. A suspension, on the other hand, is warranted not to punish an employee, but to rehabilitate him and deter him and his fellow employees from similar misconduct that has a significant impact on management's legitimate interests.

whether its action was fair or unfair.  "Just cause" is the standard, not the arbitrator's personal sense of fairness.[8]

Here, the Company never doubted the genuineness or the severity of Felton's condition.  He was neither a fabricator nor a malingerer.  He was not sitting out on the St. John's River spending the day fishing for bass. He was seriously ill.

On the other hand, Felton precipitated this crisis by pressuring his doctor to release him early to return to work. That might have been understandable -- he had no money, he had to work, he didn't want to lose his job -- but it was wrong nonetheless. He could have endangered himself

---

[8] Finally, McCoy states that an arbitrator can only set aside a "penalty" when it is "proved" the employer's action was the result of "discrimination, unfairness, or capricious and arbitrary action." Here McCoy reverses the burden of proof, apparently imposing the obligation on the union to try to set aside a wrongful employment action. That is not what is now generally understood as required under the "just cause" standard.  Management must make out its case.

An arbitrator does not have an open-ended charter to review the "fairness" of management's discipline. He does have the obligation, however, to follow the contract and apply the standard the parties provided as the measure of a company's action. That does not mean, as McCoy says, that a union would take every case to arbitration, a result he claims would somehow "be as intolerable to employees as to management." Unions do not take every case to arbitration. Some discharges are warranted, and unions understand that. In other cases, however, unions do process matters to arbitration. When they arrive at that step, grievants are entitled to the rights set forth in their agreements, nothing more and nothing less.

and his fellow employees had he returned to work at that time.[9] When he did return to work on April 18, he was still not safe and ready for work. That conduct by the Grievant deserves serious discipline.  No employee should act in a way that creates a potential safety hazard to himself and to others.

As of May 10, 2002, however, the Company had the documentation it sought that established without question that there was no basis for terminating Felton.  The Grievant's misconduct, however, would have warranted a lengthy discipline, at most a four-week suspension. By way of remedy, the Company shall return Mark Felton to his former position with no loss of seniority.  It shall also make him whole from May 17, 2002, until the date of his reinstatement, minus four weeks pay and any earnings he received from other employment during the back pay period.

The Union requests that the Arbitrator award interest on any back pay.  It cites Dennis Nolan's opinion in <u>Atlantic Airlines, Southeast</u>, 101 LA 515, 525 (1993). Professor Nolan's argues:

> In virtually all other forums. . . a prevailing party routinely receives interest on delayed payments. That is a matter of simple justice: getting a sum a year late does not make the recipient whole . . . There is no logical reason why labor arbitration remedies should differ from those applied, for example, by the National Labor Relations Board.

There are good reasons, however, for not awarding interest in labor arbitrations as a matter of course. First of all, as Professor Nolan

---

[9] Felton experienced symptoms that could have led to serious consequences back in the plant. People suffering from his condition can fall asleep in the

acknowledges, as a matter of practice arbitrators do <u>not</u> award interest in the absence of truly deliberate and reprehensible employer action. This prevailing, perhaps uniform, practice is well known by the parties, which might explain why unions seldom seek interest. Such a "no-interest" practice might be seen as part of the "just cause" formulae the parties adopt when they insert that standard in their contracts. An arbitrator should be reluctant to impose a normally unusual remedy without a contractual basis.

We know that an arbitrator may find a discharge wrongful under the "just cause" standard without a finding of employer "fault" or "intent." The "other forums" where interest is awarded normally require proof of employer fault or culpability, for example, proof of "motive" in an Section 8(a)(3) Labor Board unfair labor practice case for a discriminatory discharge. Arbitration is different. In this forum, in discharge and discipline cases we focus primarily on the employee's conduct to determine whether he failed to live up to his side of the employment bargain.

Finally, we know that an arbitration decision can never really put the parties back to where they would have been had the discharge not been effected. If there had been no discharge, the employee would have continued to work and the employer would have received the benefit of the employee's services in exchange for pay.   A back pay award of lost pay without interest may not fully "compensate the injured employee for the

_____

middle of a job, not a good thing when you are "working heights."

delay in payment," as Professor Nolan says, but (again assuming a no-fault situation) it is a better way of recognizing that both sides have lost something.[10]

In focusing on the remedy in Mark Felton's case, we must also consider the fact that safety matters are involved. As a result, the Company shall have the right to have Felton examined medically. If it is determine that he is medically unfit to perform his former duties, the Company shall reinstate Felton to alternative employment that makes a reasonable accommodation for his medical condition, but at no reduction in his rate of pay.

---

[10] Will this balance -- the overwhelming practice in labor arbitration -- encourage employers to discharge employees knowing their exposure is limited to just back pay?  Why would a company fire a productive employee and then pay him for time lost?  That would make no sense.

## VII.   AWARD

The Company did not have just cause to discharge the Grievant in accordance with the provisions of the Collective Bargaining Agreement. The grievance is granted in part and denied in part. By way of remedy, the Company shall return Mark Felton to his former position with no loss of seniority. It shall also make him whole from May 17, 2002, until the date of his reinstatement, minus four weeks pay and any earnings he received from other employment during the back pay period. He shall receive no interest on the back pay.

The Company shall have the right to have Mark Felton undergo a medical examination at the Company's expense. If it is determined that he is medically unfit to perform his former duties, the Company shall reinstate Felton with no loss of seniority to alternative employment that makes a reasonable accommodation for his medical condition, but at the same rate of pay. The grievance is sustained in part and denied in part, and therefore under the Agreement the expenses of the Arbitrator shall be borne equally between the parties.

Roger I. Abrams
Arbitrator

Boston, MA
April 28, 2003

27

**3**

**HUSSEIN ZABAD, MD, PA**
800 Zeagler Drive, Suite 200
Palatka, FL 32177
Phone (386) 326-0596
Fax (386) 326-0598

## RELEASE TO RETURN TO WORK

Please be advised that **Mark Felten** was seen in my office on
04-03-02 for Antigue, Subnation Cheopopna

Return to work date: 4-6-02 ___ Full Duty
___ Light Duty

Restrictions: _____ none _____

Follow up: Imo. 5/3/2002

Physician Signature _H. Qab_ Date 04-05-02

Returned To Work 4/1/8 and provided
This To Carl Krueger

$C_0 E \times 1$



*Fax to Dr David Brunl*
*At 328 5551*

**HUSSEIN ZABAD, MD, PA**
**800 Zeagler Drive, Suite 200**
**Palatka, FL  32177**
**Phone (386) 326-0596   Fax (386) 326-0598**

May 10, 2002

RE:   Mark Felten

To Whom It May Concern:

Mark Felten was seen in my office on January 16, 2002, complaining of increased
fatigue, sleepiness, and tiredness.  He added that he felt he was unable to drive for fear of
falling asleep while behind the wheel.  For safety reasons, I took him out of work so that
he could undergo further evaluation.  The evaluation revealed that the patient was
suffering from obstructive sleep apnea, which resolved with the use of a CPAP machine.
He also suffered from depression that improved with the use of Effexor.

At this time, I feel the patient is able to return to full-duty work on Monday, May 13th,
2002, with no restrictions.  If any further information is needed, please feel free to contact
my office.

Sincerely,

Hussein Zabad, MD

khl

5



**Seminole Electric**
**C O O P E R A T I V E, I N C.**

IN PARTNERSHIP WITH THOSE WE SERVE

May 17, 2002

Mark W. Felten
2525 Silver Lake Dr.
Palatka FL 32177

Dear Mr. Felten,

    This letter is notification that Seminole Electric Cooperative Inc. has decided to terminate your employment effective May 17th, 2002. The company's decision is a result of your violation of the following policies, practices, and articles: Termination policy 514 section II, paragraph B, sub paragraph 2E, Disability policy 517 section II, Paragraph D subparagraph 1, Attendance practice 5001.55 section 2.2 paragraphs 2.2.2, 2.2.4, and 2.2.6 as well as section 2.3 paragraph 2.3.1.1, Collective bargaining agreement with local union #551 article VI section 4 paragraph 7.

    On April 15, 2002 you contacted Carl Krueger to inform him that you would be returning to work on April 18, 2002. You in fact did return to work on April 18, 2002, but upon returning to work you presented Carl with a note from your physician indicating that you were released to return to work with no restrictions as of April 6, 2002. Carl upon reading the note then instructed you to leave work and return to your physician in order to obtain documentation explaining your absence from work during the period from April 6, 2002 until April 18, 2002. On April 19, 2002 you returned to work with a statement from a second physician indicating you were under evaluation, but had nothing to indicate a valid reason for your absence during the period in question. You were again instructed to return to your doctors and obtain documentation to excuse you from work during the period in question. On April 24, 2002 Carl called you at home and requested you come into the plant for an investigatory meeting to be held April 25, 2002. At this meeting you failed to produce documentation which would explain a valid reason for your absence from work during the period in question. Since that time you have been contacted numerous times and instructed to provide us with a valid reason for your absence during the period in question. As of May 7, 2002 you have provided no document which would excuse your absence from work during the period in question. This constitutes a very serious violation of Seminoles policies and practices mentioned above. Based upon these facts we are left with no choice but to terminate your employment effective on the date of this letter.

                                        Sincerely,

                                        Richard A. Mills
                                        Human Resources Administrator

cc: Steve Shearer
    Jim Duren
    Paul Shipskie
    Ken Hart

U - 9

890 N. Highway 17   Palatka, Florida 32177
Telephone 386.328.9255   Fax 386.328.5551   www.seminole-electric.com

6

# PROCEDURES MANUAL

| PROCEDURE TITLE: **EMPLOYEE REPORTING OF ABSENCE FROM WORK** | | | |
|---|---|---|---|
| APPROVED BY: | SECTION: PERSONNEL | | |
| | PROCEDURE: PL-4 | | |
| | PAGE: 1 | OF: | 1 |
| | REV: 3 | DATE: | 11/16/82 |

**1.0   PURPOSE**

To implement a standard for the reporting of absences and tardiness to the appropriate supervisor.

**2.0   SCOPE**

Applicable to all employees.

**3.0   PROCEDURE**

3.1   Absence from work for reasons other than illness or vacation must be authorized in advance, by the employee's immediate supervisor and department director.

3.2   Sick leave is available for sickness only, and when an employee is unable to report to work due to illness, he/she must report this fact directly to his/her immediate supervisor or department director at the earliest possible time, but in no event later than one hour after scheduled time to commence work, except in cases of extreme emergency.

3.3   Tardiness is to be reported by the employee directly to his/her immediate supervisor or department director immediately.  If the employee's  immediate supervisor or department director is not available, the employee is to report to one to the other Seminole department directors.

3.4   Abuse of sick leave, routine tardiness, or unauthorized absence from work, are grounds for disciplinary action of an employee.

7

POLICY NO. 514                                1                        DATE EFFECTIVE:   2/10/00
                                                                       SUPERSEDES:          4/8/99


POLICY NO. 514                                                        DATE EFFECTIVE:   2/10/00
                                                                       SUPERSEDES:          4/8/99

## SEMINOLE ELECTRIC COOPERATIVE, INC.

## TERMINATION

I.   **OBJECTIVE**

To formalize the conditions under which an employee may terminate or be terminated in order to equitably protect the interest of both Seminole Electric Cooperative, Inc. (Seminole), and the employee.

II.  **CONTENT**

A.   Termination Initiated by the Employee:

1.   The resignation should be in writing with an effective date and should be directed to the employee's immediate supervisor with a copy to the Senior Vice President and Assistant General Manager.  Advance notice of four weeks should be given by members of the management, supervisory, and professional staff and two weeks by all other employees.

B.   Termination Initiated by Seminole:

1.   A supervisor may terminate a member of his or her immediate staff only after obtaining appropriate management concurrence of and after consultation with the Senior Vice President and Assistant General Manager and the approval of the General Manager.

2.   Actions resulting in discipline, up to and including discharge, include but are not limited to the following:

a.   Inadequate performance of work after written warning and appropriate efforts by the supervisor and/or the Human Resources Department to assist and counsel the individual.

b.   Habitual disregard for the established hours of attendance after written warning.

Co Ex 9

POLICY NO. 514                 2             DATE EFFECTIVE:   2/10/00
                                                                  SUPERSEDES:        4/8/99

     c.      Refusal to obey the policies of Seminole or the reasonable instructions of the supervisor.

     d.      Disruption of employee morale by the initiation of false rumors, or working against the basic philosophy and objectives of Seminole.

     e.      Unjustified absence without leave.

     f.      The unauthorized communication of vital information to those outside Seminole.

     g.      Intoxication during working hours.

     h.      Committing Seminole to expenses not falling within the authority of employees.

     i.      Any fraudulent or dishonest act or acts committed by any employee acting alone or in collusion with others.

     j.      Abuse of sick leave.

     k.      Failure to follow established safety procedures after written warning, if appropriate.

     l.      Violation of any other Seminole rules after written warning.

     m.      Use of illegal drugs or abuse of alcohol or any substance which adversely affects job performance.

     n.      Firearms on Seminole premises.

     o.      Violence or threat of violence in the work place.

     p.      Contributing to the perception among other Seminole employees of a hostile, intimidating, or offensive work environment.

3.      Other causes for termination of employment may arise from time to time as circumstances indicate. Among these is the reduction in or change or elimination of a position in Seminole. Where this is the reason of termination of employment, reasonable effort will be made to relocate an employee within the organization to his or her satisfaction.

POLICY NO. 514                     3                  DATE EFFECTIVE:  2/10/00
                                                      SUPERSEDES:       4/8/99

Should it not be possible to relocate the employee within the organization, the employee will be granted pay for accrued annual leave along with additional pay according to the following schedule:

| Severance Pay | Period of Service |
|---|---|
| 2 weeks | up to 1 year |
| 4 weeks | up to 2 years |
| 1 week | for each additional 2 years (not to exceed a total of 10 weeks) |

III.  RESPONSIBILITY

The General Manager is responsible for seeing that the intent of this policy is carried out.

**8**

POLICY NO. 517

DATE EFFECTIVE:   1/1/02
SUPERSEDES:   2/10/00

## SEMINOLE ELECTRIC COOPERATIVE, INC.

### SICK AND DISABILITY BENEFITS - BARGAINING UNIT EMPLOYEES

I.   OBJECTIVE

To establish a policy governing the administration of benefits associated with sick leave and disabilities.   The provisions of this policy shall be administered in compliance with the Family and Medical Leave Act (FMLA) and the Americans With Disabilities Act (ADA).

II.   CONTENT

EFFECTIVE JANUARY 1, 2002, THIS POLICY NO LONGER APPLIES TO NON-BARGAINING UNIT EMPLOYEES.

A.   Sick Leave

1.   Sick leave may be accrued by Seminole Electric Cooperative, Inc. (Seminole) regular full-time employees at the rate of one day per month and by regular part-time employees at the rate of one-half day per month.

2.   An employee may use sick leave for:

a.   Personal illness

b.   Outpatient treatment or examination by or under the prescription of a physician or dentist.

3.   There is no limit on the accumulation of sick leave.   Payment of sick leave shall be made from the available hours in an employee's sick leave account.   In the event an employee is eligible for other compensation due to disability, illness or an accident, sick leave shall be used only to the extent it is necessary to assure regular straight-time pay during absence from work.   There will be no pay for sick leave upon termination of employment.   Employees who retire at age 55 or later may apply accrued sick leave toward the premium of Seminole medical insurance in accordance with the Board approved Sick Leave Incentive Plan.   Sick leave will not accrue during periods of leave of absence without pay.

4.   Employees shall submit medical certificates or other acceptable evidence of illness for sick leave whenever requested to do so by their

G. Ex 17

POLICY NO. 517                    2              DATE EFFECTIVE:  1/1/02
                                                 SUPERSEDES:    2/10/00

immediate supervisor.

5.   When illness or injury occurs during annual leave, the employee may charge that portion of the leave to sick leave if he or she presents a physician's certificate or other acceptable evidence to his or her supervisor upon returning from leave.

B.   Accident and Sickness Insurance (Short Term Disability)

1.   Seminole provides short-term disability benefits for periods of eligible disability of more than seven days and through thirteen weeks.

2.   Full-time employees and those employees fulfilling federal requirements are eligible for participation in the short-term disability program upon employment.

3.   Accident and Sickness Insurance Benefits are payable in accordance with the Certificate of Insurance.  Guidelines are available in the Human Resources Department.

C.   Long Term Disability

1.   Seminole provides long-term disability benefits for periods of eligible disability of more than 13 weeks.

2.   Full-time employees and those employees fulfilling federal requirements are eligible for participation in the long-term disability program upon employment up to age 69-1/2.

3.   Long Term Disability Benefits are payable in accordance with the Certificate of Insurance.  Details are available in the Human Resources Department.

D.   Reinstatement

1.   An employee will be expected to return to work after a disability upon receipt of a medical release from an attending physician stating the employee may perform normal job duties.  If the employee chooses not to return upon medical release, his or her position may be filled and employment terminated.

2.   Seminole will hold a position vacant for 90 days or until all sick leave and annual leave are exhausted, whichever is greater, except when an individual is determined by medical examination to be permanently disabled and unable to return to work.  If a disability extends beyond that period, Seminole reserves the right to fill the vacant position.

POLICY NO. 517                              3                    DATE EFFECTIVE:  1/1/02
                                                                SUPERSEDES:      2/10/00

    3.    No employee may return to work following a disability without a medical release from an attending physician stating that the employee is able to perform his or her normal job duties.

E.    <u>Continuing Benefits During Illness or Disability</u>

    1.    The employee will continue to be covered by the group benefit insurance program while on annual leave, sick leave, workers' compensation, up to 13 weeks of short-term disability, and the first six months of long-term disability.  The employee will be required to continue to pay the employee's normal share of premium costs during this time.

    2.    After the first six months of long-term disability and/or workers' compensation, the employee may continue medical/dental coverage by paying the full premium cost.  The employee may convert dependent term life insurance to an individual policy with the insurance carrier by paying the full premium cost.

    3.    Sick and annual leave continue to accrue until all sick and annual leave are determined to be exhausted, unless an employee is on leave without pay.

    4.    When it has been determined that an employee has exhausted all sick and annual leave, holidays will no longer be credited.

III.    RESPONSIBILITY

The General Manager is responsible for seeing that the intent of this policy is carried out.

**9**



| Subject | Section | Issue Date 05/03/02 | Page 1 of 5 |
|---|---|---|---|
| ATTENDANCE/TARDINESS | SGS PLANT PRACTICE | Approved By W. P. Shipskie | Number 5001.55 R2 |

## 1.0   STATEMENT OF PURPOSE

It is the position of Seminole Electric that employees have the obligation to report regularly and on time for work.  Employees are expected at all times to maintain themselves in a condition fit and able to perform their work in a safe and productive manner.

The Company has agreed to provide various wages, benefits, and other assurances to employees partially in exchange for their assurance of regular and prompt attendance.

Absenteeism and tardiness is a disservice not only to the Company, but also to other employees who conscientiously report to work.

Employees who fail to report regularly and on time for work, who fail to maintain themselves in a condition fit and able to perform their jobs, and who fail to perform their jobs safely and efficiently will subject themselves to disciplinary action including termination of employment.

It is not intended that this practice shall in any way take priority over the work schedule flexibility provided to employees with an Exempt Wage and Hour status.

## 2.0   PRACTICE DETAIL - ATTENDANCE

**2.1**   In order to maintain the work force at the highest possible point of efficiency and dependability, and to minimize the increased workload of associated employees which results from absenteeism and tardiness, SGS Management has established the following practice.

**2.1.1**   Management reserves the following rights:

2.1.1.1   To approve or to disapprove, the request of an employee for permission to be absent from work.

2.1.1.2   To investigate absences and the reasons for them.

2.1.1.3   To determine whether or not an absence was necessary or justifiable and determine whether it will be excused or unexcused.

2.1.1.4   To require employees, at Management's discretion to provide a written doctor's
excuse and/or other medical justification establishing that the absence was due to a bona fide sickness or injury.

**2.1.2**   The accumulation of vacation or sick leave hours for an employee does not

| Subject | Section | Issue Date 05/03/02 | Page 2 of 5 |
|---|---|---|---|
| **ATTENDANCE/TARDINESS** | **SGS PLANT PRACTICE** W. P. Shipskie | Number 5001.55 R2 | |

automatically permit the employee to schedule time off at his/her discretion. All scheduled time away from work must be approved in advance by supervision.

**2.1.3** Unscheduled absences from work, requested in advance and <u>not</u> approved, may be subject to disciplinary action.

**2.1.4** Supervisors will be responsible for routinely monitoring attendance and tardiness records for their employees.

**2.1.5** All employees are encouraged to conserve their sick leave hours in order to avoid reduction or loss of pay in the event of serious injury or illness.

## 2.2   UNSCHEDULED ABSENCE FROM WORK - WITH NOTIFICATION

**2.2.1** Employees are expected to report promptly for work in their designated work areas at the scheduled time.

**2.2.2** When an employee is unable to report to work, he/she must personally notify his/her supervisor (or designee) prior to the start of the work shift. At that time, he/she should also inform the supervisor (or designee) of the reason for the absence.

**2.2.3** Employees should give as much advance notice as possible, but should at a minimum notify the supervisor prior to the start of the shift.

**2.2.4** Absence without adequate and proper notification or under false pretenses may result in loss of pay and/or disciplinary action.

**2.2.5** Conferences may be held with employees to review attendance problems. These will be approached in a manner to assist the employee in solving the reasons for their attendance difficulties.

**2.2.6** Supervision reserves the right to review an employee's sick leave usage at any time and to base corrective action and/or impose future requirements of doctor certification on individual employees because of their record of usage. All absences due to illness in excess of three (3) consecutive days automatically require a doctor's certification.

## 2.3   UNSCHEDULED ABSENCE FROM WORK - WITHOUT NOTIFICATION

| Subject | Section | Issue Date 05/03/02 | Page 3 of 5 |
|---|---|---|---|
| **ATTENDANCE/TARDINESS** | **SGS PLANT PRACTICE** Approved By W. P. Shipskie | | Number 5001.55 R2 |

**2.3.1**  Unscheduled absence from work without notification will result in the following corrective action unless Management excuses the employee's failure to notify.

  **2.3.1.1**  Absence from two (2) or more consecutive work shifts will result in termination of employment after review by Human Resources and approval by the General Manager.  The individual will also be classified ineligible for rehire.

  **2.3.1.2**  Two (2) separate occurrences within a consecutive twelve (12) month period will escalate as follows:

  **2.3.1.2.1**  First occurrence:
  Corrective Action: Decision Making Leave (DML) in accordance with Plant Practice 5001.56.

  **2.3.1.2.2**  Second occurrence:
  Corrective Action:  Discharge/termination in accordance with Plant Practice 5001.56. The employee will be classified ineligible for rehire.

## 3.0  TARDINESS

**3.1**  It is in the best interest of our organization for punctuality to be observed at all times.  The proper number of employees appropriately scheduled for the shift ready to begin work at the appointed time is essential to our organization.  Employees are expected to be in their designated work areas ready to begin work, at the start of their scheduled shift.  Employees are expected to observe appointed break and lunch periods in accordance with Plant Practice 5001.23.

**3.2**  Tardiness is defined for the purpose of this practice as reporting for work in the designated work area at any time beyond the employees scheduled time to begin work. SGS time will be determined through methods established by Management.

**3.3**  Corrective action will escalate for continued incidents of tardiness, as follows:

Issue Date 05/03/02     Page 4 of 5
Approved By        Number
W. P. Shipskie       5001.55 R2

Subject                                               Section

## ATTENDANCE/TARDINESS            SGS PLANT PRACTICE

**Step 1.**      Two (2) times tardy in any consecutive twelve (12) month period.

Corrective Action: Documented oral reminder and employee conference with the immediate supervisor.

**Step 2.**      Three (3) times tardy in any consecutive twelve (12) month period.

Corrective Action: Written reminder and employee conference with the immediate supervisor.

**Step 3.**      Four (4) times tardy in any consecutive twelve (12) month period.

Corrective Action: The employee will be given a Decision Making Leave (DML) or other disciplinary action* in accordance with Plant Practice 5001.56.

* If other disciplinary action is administered, another tardiness event will result in a DML.

NOTE: Upon receiving a D.M.L., subsequent disciplinary action will be administered in accordance with Plant Practice 5001.56.

**3.4**     Probationary Employees

**3.4.1** The application of this practice to probationary employees will be as follows:

1.     One (1) failure to report an absence will result in termination.

2.     Two (2) instances of tardiness will result in termination.

The termination of a probationary employee will occur only after a review by Human Resources, and approval of the General Manager.

## 4.0   EXCEPTIONS TO THE ATTENDANCE AND TARDINESS PRACTICE

**4.1**     In order to achieve fairness and consistency in the application of this practice, all exceptions must be reviewed by Human Resources.

## 5.0   PERIODIC REVIEW OF EMPLOYEE'S RECORD

# 0204  10/89

| Subject | Section | Issue Date 05/03/02 | Page 5 of 5 |
|---|---|---|---|
| **ATTENDANCE/TARDINESS** | SGS PLANT PRACTICE | Approved B. | Number |
| | | W. P. Shipskie | 5001.55 R2 |

The employee's total attendance/absence record will be periodically reviewed with the employee and the totality of that record will be considered as it relates to job performance obligations.   The totality of an employee's attendance/absence record, including unacceptable patterns of absence or tardiness, could be deemed appropriate cause for disciplinary action, including termination of employment.

# 0204  10/89

**10**



Issue Date 11/9/95        Page 1 of 9

Approved By J. Pittman   Number   5001.56

R4

**Subject**
## DISCIPLINARY ACTION

**Section**
## PLANT PRACTICE

## 1.0   STATEMENT OF PURPOSE

In order to insure consistency and fairness in the application of discipline, Seminole Electric Cooperative, Incorporated (SECI) has developed the following practice.  SECI follows the concept of positive discipline applied in a progressive manner.  Employees must meet certain standards and perform their jobs in a safe and efficient manner for the benefit of all concerned.  It is SECI's goal to assist employees in recognizing and solving problems that result from unacceptable behavior, conduct, and performance.

## 2.0   LIMITATIONS

Nothing in this practice is intended to nor shall it limit those rights of SECI set forth in the Collective Bargaining Agreement (CBA), including but not limited to those set forth in Article VI.  In the event that the CBA is inconsistent with this practice, the CBA shall prevail for Bargaining Unit employees.

## 3.0   PRACTICE

### 3.1   GENERAL

**3.1.1**  Supervisory personnel are encouraged to confer with their chain of command and Human Resources for input prior to disciplining an employee.

**3.1.2**  Any deviations in the administration of this practice must be approved by the Director of Human Resources (or designee) and the appropriate level of management.

**3.1.3**  This practice is intended to provide recommended but not mandatory penalties to apply to specific offenses.  However, the penalty utilized shall be discretionary with management and nothing herein shall require that a particular form of discipline be utilized in any case prior to the utilization of another form of discipline.  All disciplinary actions for behaviors not listed in this practice must be discussed with a Human Resources representative.

# 0204  10/89

U Ex 1



R4

Subject
**DISCIPLINARY ACTION**

Section
**PLANT PRACTICE**

3.1.4  The example offenses listed in this practice are not intended to be all inclusive.  In addition to the offenses specifically identified in this practice, employees may be disciplined up to and including discharge for other unacceptable conduct or just cause.  However, the example offenses listed in this practice will normally serve as  guidance for disciplinary action for any infraction not identified in this practice.

3.1.5  Oral and written reminders will not be considered as part of the employee's performance record and will be removed from the employee's personnel file upon request of the employee, if the employee has not received any oral or written reminders or more severe discipline for a period of one (1) year, or more.

In order for oral and written reminders to not be considered in subsequent disciplinary actions, the oral and/or written reminders must be over a year old and the employee must not have received any disciplinary actions within a year preceding the current discipline.  Otherwise, they may be considered.  Such discipline may be given additional weight when the action for which the discipline being considered is related to prior discipline or demonstrates a pattern of unacceptable behavior (performance, conduct, attendance, etc.).  All other forms of discipline will not be removed from employees files and may be considered in subsequent disciplinary actions at any time.

**3.2    DISCIPLINARY STEPS**

3.2.1  SECI recognizes the following levels of disciplinary actions:   .

| | | |
|---|---|---|
| • | * | Oral Reminder |
| • | * | Written Reminder |
| • | | Suspension Without Pay |
| • | | Transfer |
| • | | Probation |
| • | | Demotion |

# 0204  10/89



Issue Date 11/9/95          Page 3 of 9

Approved By J. Pittman   Number   5001.56

R4

Subject
**DISCIPLINARY ACTION**

Section
**PLANT PRACTICE**

- • * Suspension With Pay (Decision Making Leave - DML)
- • Combination of Any of the Above
- • * Discharge/Termination

\* NOTE:    The normal progression of disciplinary steps is intended to be oral reminder, written reminder, decision making leave, and termination, if necessary.  However, the Company reserves the right to use any of the forms of discipline at any time.  Generally, since a DML involves a serious commitment to correct **ANY** and **ALL** performance, attendance, or behavior deficiencies, no other discipline will be used after a DML other than termination.  It is appropriate to consider the other forms of discipline before a DML is used.

**3.2.1.1**    **Oral Reminder**
Oral reminders may be given by the employee's immediate supervisor at any time circumstances warrant.  While no additional approval is required, supervisors will consult with their chain of command and Human Resources prior to initiating action.

**3.2.1.2**    **Written Reminder**
Written reminders are typically used when oral reminders have failed to result in behavior or performance changes, or, when the behavior is serious enough to warrant stronger corrective action.  While no additional approval is required, supervisors are expected to consult with their chain of command and Human Resources prior to initiating action.

**3.2.1.3**    **Suspension Without Pay**
Suspension without pay requires consultation with the Plant Personnel Administrator and approval of the Plant Manager.

# 0204  10/89

 **SEMINOLE ELECTRIC COOPERATIVE INCORPORATED**

Issue Date 11/9/95        Page 4 of 9

Approved By J. Pittman   Number   5001.56

R4

| Subject | Section |
|---|---|
| **DISCIPLINARY ACTION** | **PLANT PRACTICE** |

**3.2.1.4    Transfer**
Transfer requires consultation with the Plant Personnel Administrator and approval of the Plant Manager.

**3.2.1.5    Probation**
Probation is an appropriate form of discipline depending on the severity of the problem and when an employee has documented performance or behavioral problems and is expected to solve them to management's satisfaction within a given period of time. Probation requires consultation with the Plant Personnel Administrator and approval of the Plant Manager.

**3.2.1.6    Demotion**
An employee may be demoted when prior attempts to correct problems with performance or behavior  have failed. Demotions require consultation with the Plant Personnel Administrator and approval of the Plant Manager.

**3.2.1.7    Decision Making Leave (DML)**
A DML is one (1) day off with pay at the Company's expense. A DML is taken as the last step prior to termination. While on leave, employees are instructed to review their behavior and/or performance and the applicable SECI policy. Immediately upon return to work, employees are required to make a written commitment to improve their behavior/performance or resign their position. Failure to make an acceptable commitment or failure to fulfill the commitment could result in termination. A DML requires consultation with the Plant Personnel Administrator and approval by the Plant Manager. The commitment made after a DML involves **TOTAL PERFORMANCE**. This means that no other forms of discipline will normally be administered following a DML and a commitment other than termination of employment.

# 0204  10/89



Issue Date 11/9/95          Page 5 of 9

Approved By J. Pittman   Number   5001.56

R4

Subject
**DISCIPLINARY ACTION**

Section
**PLANT PRACTICE**

**3.2.1.8     Combination of Any of the Above**
Combination of any of the above requires consultation with the Plant Personnel Administrator and approval of the Plant Manager.

**3.2.1.9     Discharge/Termination**
Terminations occur when other disciplinary steps have failed or when the infraction is considered severe enough that termination without prior discipline is warranted. Supervisors must consult with their chain of command prior to initiating termination. Terminations may only occur after consultation with the Director of Human Resources and approval by the General Manager.

**3.2.2** SECI reserves the right to use any form of disciplinary action it deems appropriate in each circumstance and will routinely consider the facts, circumstances, and mitigating factors applicable to each disciplinary action on a case by case basis.

## 3.3     INVESTIGATIVE SUSPENSION

**3.3.1** An investigative suspension without pay may be used at any time in the disciplinary process to gather additional facts necessary to determine the appropriate disciplinary action to be taken, if any.

**3.3.2** Investigative suspensions may be undertaken at any time circumstances are deemed appropriate. A Human Resources representative should normally be consulted prior to suspending an employee.

**3.3.3** When considered appropriate, employees will be suspended pending

# 0204  10/89



Issue Date 11/9/95        Page 6 of 9

Approved By J. Pittman   Number   5001.56

R4

Subject
**DISCIPLINARY ACTION**

Section
**PLANT PRACTICE**

investigation when potential termination of employment is being considered.

### 3.4   MULTIPLE INFRACTIONS

**3.4.1**   Normally, infractions that occur will be treated in a progressive fashion. However, SECI reserves the right to begin corrective action at any disciplinary step, depending on the circumstances and uniqueness of any individual situation.

**3.4.2**   Offenses may fall into three (3) categories:

> Conduct Problems
> Performance Problems
> Attendance Problems

**3.4.3**   The maximum number of oral reminders that may be active at one time (before the next progressive disciplinary step is considered) is three (3). The categories of conduct and attendance may have no more than one active oral reminder at a time. The performance category may have no more than two (2) oral reminders at a time. The category of performance is rather broad. To have two oral reminders in the performance category, the performance deficiencies must be significantly different. Regardless of whether an employee had one or two active oral reminders in the performance category, the total number of active oral reminders, for all categories, must not exceed three.

**3.4.4**   The maximum number of written reminders that may be active at one time (before the next progressive disciplinary step is considered) is two (2). The categories of attendance and conduct may have no more than one active written reminder at a time. The performance category may have no more than two written reminders at a time. The category of performance is

 **SEMINOLE ELECTRIC COOPERATIVE INCORPORATED**

Issue Date 11/9/95        Page 7 of 9

Approved By J. Pittman   Number   5001.56

R4

Subject                                    Section
**DISCIPLINARY ACTION**                    **PLANT PRACTICE**

rather broad. To have two written reminders at a time in the performance category, the performance deficiencies must be significantly different. Regardless of whether an employee has one or two written reminders in the performance category, the total number of active written reminders for all categories must not exceed two.

**3.4.5** Because a DML is a total performance decision on the employee's part, there may be only one (1) active DML at a time. No other formal steps of discipline will normally be administered during this time other than termination of employment.

## 3.5  DOCUMENTATION

Each step of disciplinary action must be properly documented in writing, reviewed by the employee, and placed in the employees's personnel file. The documentation should include:

A.    Identification of the problem(s), actions to be accomplished by the employee, and the time frame(s) for improvement and/or reassessment.

B.    The documentation for oral reminders may be hand written where all other forms of discipline should be typed, and they may also contain less detail than is required of written reminders or more severe forms of disciplinary actions.

C.    For written reminders or more formal disciplinary actions, the consequences of failing to meet the standards of performance must also be documented.

D.    The employee's signature indicating that the details concerning the discipline have been reviewed with him/her.

## 3.6  GROUP I OFFENSES AND PENALTIES

First Offense          -      Oral Reminder
Second Occurrence      -         Written Reminder

# 0204  10/89



Issue Date 11/9/95        Page 8 of 9

Approved By J. Pittman  Number    5001.56

R4

Subject
## DISCIPLINARY ACTION

Section
## PLANT PRACTICE

Third Occurrence    -    DML
Fourth Occurrence -    Termination

(Each occurrence refers to a repeat of an offense in the same category.  Attendance problems are addressed in Plant Practice 5001.55.)

### EXAMPLE OFFENSES AND APPLICABLE CATEGORY

Performance 1.    Clearance violations such as signing on or off on a clearance in the wrong space or using an incorrect date or time.

Conduct    2.    Leaving the work area during shift without permission or similar improper absence from duty without authority.

Conduct    3.    Conducting personal work on paid time.

Conduct    4.    Unauthorized visits from other personnel in the work area.

Performance 5.    In a non-probationary status, failure to meet job standards in relation to either quantity, quality, or timeliness of work at any time.

Conduct    6.    Excessive personal calls, either placed or received during the work shift.

Conduct    7.    Interfering with the work of other employees.

Conduct    8.    Horseplay.

Conduct    9.    Altering or removing any material posted by the Company or posting any material without authorization.

Performance 10.    Failure to immediately report an unsafe condition, practice, or incident to the appropriate supervisor or manager.

# 0204  10/89



Issue Date 11/9/95          Page 9 of 9

Approved By J. Pittman   Number   5001.56

R4

**Subject**
## DISCIPLINARY ACTION

**Section**
## PLANT PRACTICE

Performance 11.   Creating, contributing, or allowing an unsafe condition to exist or to continue unreported.

Conduct      12.   Making early preparation for leaving the work area prior to the end of the work shift, unless authorized.

Conduct      13.   Use of SECI equipment, resources, or of another employee's equipment without authorization.

Conduct      14.   Excessive garnishments to the extent allowed by law.

**3.7   GROUP II OFFENSES AND PENALTIES**

First Offense -      Written Reminder
Second Occurrence      -      DML
Third Occurrence      -      Termination

(Each occurrence refers to repeat of an offense in the same category.   Attendance problems are addressed in Plant Practice 5001.55.)

**EXAMPLE OFFENSES** AND APPLICABLE CATEGORY

Conduct      1.      Failure to follow appropriate guidelines for calling in sick.

Conduct      2.      Sleeping on the job or work shift unintentionally.

Conduct      3.      Discourteous, insulting, abusive or inflammatory language or conduct toward the public, a fellow employee or employees as determined by the Plant Manager, subject to his investigation.

Conduct      4.      Unauthorized use or release of confidential information.

# 0204  10/89



Issue Date 11/9/95        Page 10 of 9

Approved By J. Pittman   Number   5001.56

R4

Subject                                                    Section
**DISCIPLINARY ACTION**                     **PLANT PRACTICE**

Conduct    5.    Actual or attempted intimidation or coercion of employees, supervisors, or visitors.

Performance 6.    Clearance violations such as working on equipment without the proper clearance or hanging a clearance tag (red tag) incorrectly.

Performance 7.    Contributing to unsafe practices or conditions.    Failure to follow established safety guidelines in the performance of job duties.

Conduct    8.    Personal long distance telephone calls charged to the Company.

Conduct    9.    Failure to follow supervisory instructions not considered serious enough to be classified as insubordination. (addressed in Group IV).

Conduct    10.    Carelessness and/or negligence in the handling or control of Company property, or the improper appropriation of Company property.

Performance 11.    Committing the Company to expenses not within the authority of the employee.

Conduct    12.    Unauthorized use of Company vehicles.

Conduct    13.    Failure to respond to a beeper call by telephone within 20 minutes.

**3.8    GROUP III OFFENSES AND PENALTIES**

First Offense -        DML
Second Offense (from any group)        -        Termination

**EXAMPLE OFFENSES** AND APPLICABLE CATEGORY

Conduct    1.    Reporting to work under or while on duty being under the influence of illegal, controlled substances or alcoholic beverages.

# 0204  10/89



Issue Date 11/9/95        Page 11 of 9

Approved By J. Pittman   Number    5001.56

R4

| Subject | Section |
|---|---|
| **DISCIPLINARY ACTION** | **PLANT PRACTICE** |

Conduct      2.      Sleeping on the job or work shift intentionally.

Conduct      3.      Sexual or racial harassment.

Conduct      4.      Unauthorized use or release of confidential information of a serious
             nature.

Conduct      5.      Violation of a safety guideline or procedure which results in the possible
             endangering of other persons or of the work environment.

Conduct      6.      Transporting a firearm or other weapons on Company property.

Performance 7.      Clearance violations such as unauthorized removal of ~~red~~ clearance tags.

Conduct      8.      Failure to report to work when ordered on call-in.

Conduct      9.      Falsification or misrepresentation of need for sick leave or any other type
             of paid time off.

**3.9     GROUP IV OFFENSES AND PENALTIES**

         First Offense -      Termination

         **EXAMPLE OFFENSES** AND APPLICABLE CATEGORY

Conduct      1.      Fighting.

Conduct      2.      Assault with a dangerous weapon.

Conduct      3.      Threatening physical harm to people or property.

Conduct      4.      Physical possession of a firearm or other weapon on Company property.

# 0204  10/89



Issue Date 11/9/95        Page 12 of 9

Approved By J. Pittman   Number   5001.56

R4

Subject                            Section
**DISCIPLINARY ACTION**            **PLANT PRACTICE**

Conduct     5.     Transportation or possession of an explosive on Company property.

Conduct     6.     On or off the job conduct which adversely affects the ability of the
            employee to perform his/her duties and/or the duties of other employees, and/or
            adversely affects the efficient operation of the Company.

Conduct     7.     Falsification of any document or any other dishonesty connected with the
            employee's duties or employment or in any way related to the operation of Company
            business.

Conduct     8.     Theft, actual or attempted.

Conduct     9.     Sexual or racial harassment of an extremely serious nature.

Conduct     10.    Sabotage or the willful damage or destruction of Company property or
            property belonging to fellow employees.

Conduct     11.    Possession, use, sale, attempt to sell or procure illegal, controlled
            substances or alcoholic beverages while on duty, on Company property, or while
            operating or riding in or on Company equipment.

Conduct     12.    Any other violation of civil rights prohibited by law.

Performance 13.    Clearance violations such as operation of equipment with a ~~red tag~~
            personnel or equipment clearance.

Conduct     14.    Failure to follow reasonable instruction from a
            supervisor considered serious enough to be insubordination.

Conduct     15.    Refusal to fully and truthfully cooperate in an investigation conducted by or
            at the direction of the Company in matters that affect the Company's business.

Conduct     16.    Participation in unauthorized strikes, picketing, walkout, slow-down, total

# 0204  10/89



Issue Date 11/9/95          Page  13  of 9

Approved By J. Pittman   Number    5001.56

R4

**Subject**
**DISCIPLINARY ACTION**

**Section**
**PLANT PRACTICE**

or partial interference with or stopping of the Company's operations, and refusal to cross picket lines at any location whether or not owned by the Company.

Conduct      17    Any fraudulent, criminal or dishonest act(s) committed acting alone or in collusion with others, including but not limited to stealing, embezzlement, extortion, assault or vandalism committed on the job or which affects or could reasonably be expected to adversely affect the Company's business.

**4.0   EXCEPTIONS TO THE DISCIPLINARY PRACTICE**

In order to achieve fairness and consistency in the application of this practice, all exceptions must be reviewed by the Director of Human Resources.

# 0204  10/89